

**CIRCUIT COURT FOR HOWARD COUNTY, MARYLAND**

8360 Court Avenue
Ellicott City, Maryland 21043

E-FILED; Howard Circuit C
Docket: 5/15/2020 1:47 PM; Submission: 5/15/2020 1:47

Civil: 410-313-3844
Criminal: 410-313-3822
Juvenile: 410-313-3827
Land Records: 410-313-5850
Calendar Office: 410-313-3575
Family Law: 410-313-2225

RECEIVED

2020 JUN -3 A 9: 51

OFFICE OF THE SHERIFF
HOWARD COUNTY, MD

**To:** MICHAEL MARTIRANO
10910 CLARKSVILLE PIKE
ELLICOTT CITY, MD 21042

Ck. # 1298

Case Number:        C-13-CV-19-001189
Other Reference Number(s):

**MONICA BANKS VS. MICHAEL MARTIRANO, ET AL.**

Issue Date: 5/15/2020

## WRIT OF SUMMONS

You are hereby summoned to file a written response by pleading or motion, within 30 days after service of this summons upon you, in this Court, to the attached complaint filed by:

MONICA BANKS
5345 Columbia Road
Apt H
COLUMBIA, MD 21044

This summons is effective for service only if served within 60 days after the date it is issued.

*Wayne A Robey*

Wayne A. Robey
Clerk of the Circuit Court

To the person summoned:

Failure to file a response within the time allowed may result in a judgment by default or the granting of the relief sought against you.
Personal attendance in court on the day named is NOT required.

Instructions for Service:

1. This summons is effective for service only if served within 60 days after the date issued.
2. Proof of Service shall set out the name of the person served, date and the particular place and manner of service. If service is not made, please state the reasons.
3. Return of served or unserved process shall be made promptly and in accordance with Maryland Rule 2-126.
4. If this notice is served by private process, process server shall file a separate affidavit as required by Maryland Rule 2-126(a).

## SHERIFF'S RETURN
### Circuit Court for Howard County

Sheriff fee: _____  By: _____

Served: _____

Time: _____  Date: _____

With the following:

☐ Summons               ☐ Counter Complaint

☐ Complaint            ☐ Domestic Case Information Report

☐ Motions                ☐ Financial Statement

☐ Petition and Show Cause Order    ☐ Other _____
                                                    Please specify

Was unable to serve because:

☐ Moved left no forwarding address    ☐ No such address

☐ Address not in jurisdiction          ☐ Other _____
                                                    Please specify

Sheriff fee: $ _____    _____
                                                    Serving Sheriff's Signature & Date

Instructions to Private Process Server:

1. This Summons is effective for service only if served within 60 days after the date issued.
2. Proof of Service shall set out the name of the person served, date and the particular place and manner of service. If service is not made, please state the reasons.
3. Return of served or unserved process shall be made promptly and in accordance with Rule 2-126.
4. If this summons is served by private process, process server shall file a separate affidavit as required by Rule 2-126(a).

## IN THE CIRCUIT COURT FOR
## HOWARD COUNTY, MARYLAND

**MONICA BANKS** on her own behalf and
on behalf of her minor child L.B.
5345 Columbia Road
Apt. H
Columbia, MD 21044

**Plaintiffs,**

**vs.**

**MICHAEL J. MARTIRANO** in his
capacity as Howard County Public School
System Superintendent
10910 Clarksville Pike
Ellicott City, MD 21042

and

**THE HOWARD COUNTY BOARD OF
EDUCATION**
Serve On:  Mavis Ellis (Chair of the
Board)
10910 Clarksville Pike
Ellicott City, MD 21042

and

**RUNNING BROOK ELEMENTARY
SCHOOL**
Serve On:  Anthony Esposito (Principal)
5215 W Running Brook Rd
Columbia, MD 21044

and

**HOWARD COUNTY PUBLIC
SCHOOL SYSTEM**
Serve On: Michael J. Martirano
(Superintendent of Schools)
10910 Clarksville Pike
Ellicott City, MD 21042

and

**Civil Action No.** C-13-CV-19-001189

**COMPLAINT FOR ASSAULT, BATTERY,
AND THE VIOLATION OF VARIOUS
CIVIL RIGHTS**

**Jury Trial Demanded**



1

**ANTHONY ESPOSITO** in both his capacity as an employee (present or former) of Howard County Public School System and in his individual capacity
5215 W. Running Brook Road
Columbia, MD 21044

and

**KELLY MARIE ZAWADA** in both her capacity as an employee (present or former) of Howard County School System and in her individual capacity
5223 Hermit Path
Columbia, MD 21044-0000

and

**RICH GIBSON** in his capacity as Howard County State's Attorney and his individual capacity
Carroll Building – Second Floor
3450 Courthouse Drive
Ellicott City, MD 21043

and

**OFFICE OF THE STATE'S ATTORNEY FOR HOWARD COUNTY**
Serve On: Rich Gibson (State's Attorney)
3450 Court House Drive
Second (2nd) Floor
Ellicott City, MD 21043

and

**HOWARD COUNTY OFFICE OF HUMAN RIGHTS**
Serve On: Janssen Evelyn (Acting Administrator)
9820 Patuxent Woods Drive, Suite 237
Columbia, MD 21046

and

**HOWARD COUNTY POLICE DEPARTMENT**
**Serve On:** Lisa D. Myers (Chief of Police)
3410 Court House Drive
Ellicott City, MD 21043

and

**UNKNOWN HOWARD COUNTY POLICE DEPARTMENT POLICE OFFICER** in both his capacity as a Howard County Police Officer and his individual capacity
3410 Court House Drive
Ellicott City, MD 21043

**Defendants.**

Plaintiff, Monica Banks ("Plaintiff" or "Ms. Banks"), on her own behalf and on behalf of her minor child L.B. for her complaint against the defendants named in the caption above, avers on knowledge, information and belief:

## STATEMENT OF CASE

1.    This is a civil rights action challenging the policies and practices of the Howard County Public School System ("HCPSS") as discriminatory in their impact and as discriminatory in their application as to African American students and parents.

2.    The students at Running Brook Elementary School are majority minority and are grossly mistreated, including generally being spoken to in such a manner as to presume that they are slow, developmentally delayed, and/or behaviorally challenged.

3.    This is both a civil rights and tort action challenging the actions taken by lunch monitor, Kelly Marie Zawada ("Ms. Zawada"), who was then-employed at Running Brook Elementary School ("Running Brook") as well as its principal, Anthony Esposito ("Principal

Esposito") when Ms. Zawada – with little or no verbal request – aggressively grabbed both arms of then-third grade (female) student L.B. in an attempt to move her to an assigned lunch seat. *See* the video recording of the incident attached hereto as **Exhibit A** (herein referred to as the "Incident").

4. When L.B. resisted the unnecessary, unwarranted, and inappropriate force, Ms. Zawada paused in frustration; double-backed, aggressively grabbed L.B.'s arms a second time; dragged her from the table; swung her around; dragged her to a different lunch table; dropped her on the bench and walked away without so much as a simple inquiry into her welfare or well-being after the act of aggression (the "Incident"). *See id.*

5. Although Ms. Banks was told that Ms. Zawada was terminated for the Incident, Ms. Zawada was not, in fact, terminated; rather, Ms. Zawada – a nonexempt part time employee – was treated with all the rights and privileges of an exempt employee under to the bargaining agreement between HCPSS and the Teacher's Union and placed on administrative leave pending the outcome of an investigation. However, HCPSS, did not investigate the Incident, relying instead upon the outcome of an investigation which was supposedly underway by the Howard County Police Department ("HCPD") and the Office of the State's Attorney for Howard County, Maryland ("State's Attorney").

6. Unknown HCPD Officer did not timely obtain a copy of the video taken in the matter, nor did he properly prepare the charge against Ms. Zawada.

7. Nevertheless, Ms. Zawada was charged with Second-Degree Assault; however, the Office of the State's Attorney, under the leadership of State's Attorney Rich Gibson refused to prosecute the Second-Degree Assault charge which, admittedly, he

4

understood held validity; rather, it was his belief that Ms. Zawada's termination was enough of a punishment for the illegal act.[1]

8.      According to Howard County Policy 1010 ("Policy 1010"):

The Board of Education is committed to providing an education and work environment that is free from discrimination, fosters equitable opportunities, and values diversity and commonality. The Board prohibits discrimination on the basis of race, color, creed, national origin . . . or socioeconomic status in the educational program, including co-curricular and extra-curricular activities, and in the workplace. The Board recognizes its responsibility to promote worth, dignity, respect and safety and therefore prohibits discrimination through curriculum, instruction, professional development, and resource selection. Employees, students, and third parties share responsibility for the health, safety, and general welfare of students and for creating and ensuring an environment free from discrimination. Employees, students, and third parties may be subject to disciplinary action or consequences for discriminatory behavior even when the behavior does not rise to the level of discrimination as defined.

*See* **Exhibit C.** Policy 1010 is not being honored, nor adhered to in Howard County Public Schools. Rather, there is a pervasive, persistent, illegal and unjust culture of discrimination so deeply-rooted in the Howard County Public School culture that no level of reporting or administrative process can be trusted to remedy the injuries these named and unnamed Plaintiffs are suffering on any average school day.

9.      Ms. Banks filed an official complaint of discrimination with the Howard County Office of Human Rights ("OHR") who initially declared that it would file an official charge of discrimination by and through its investigator Davis Ruiz ("Mr. Ruiz"); however, a few days later Mr. Ruiz contacted Ms. Banks by and through her undersigned counsel to inform her that

---

[1] Again, Ms. Zawada was never terminated.

OHR would no longer be pursuing a charge of discrimination because it did not have the power to investigate a complaint alleged regarding a minor child, leaving Ms. Banks with little recourse in resolving the matter short of filing the instant litigation.

## FACTUAL BACKGROUND

10.    Ms. Banks and her daughter, L.B., are both African American females.

11.    Now, and at the time of the Incident, L.B. was nine (9) years old.

12.    One June 10, 2019, Kelly Marie Zawada ("Ms. Zawada"), who was then-employed at Running Brook as a lunch monitor – with little or no verbal request – aggressively grabbed both arms of the then-third grade female in an attempt to move her to an assigned lunch seat. When L.B. resisted the unnecessary, unwarranted, and inappropriate force, Ms. Zawada paused in frustration, double-backed, aggressively grabbed Lyric's arms a second time, dragged her from the table, swung her around, dragged her to a different lunch table, dropped her on the bench and walked away without so much as a simple inquiry into her welfare or well-being after the act of aggression.

13.    In response, Principal Esposito found Ms. Zawada's behavior to be concerning enough to report the incident to Ms. Banks, but did not follow the procedures outlined in Howard County Public School System ("HCPSS") Policy 1030 ("Policy 1030") which requires that he report any and all child abuse, including child abuse exacted by a school employee to law enforcement and/or the Department of Social Services.

14.    When Ms. Banks viewed the footage the following day, she left Principal Esposito's office and contacted colleague and criminal justice reform advocate Topeka Sam ("Advocate Sam") to explain what she witnessed happen to her daughter at the hands of

6

Ms. Zawada. Advocate Sam told her to call local law enforcement to report the abuse. Ms. Banks did so and local law enforcement reported to Running Brook's campus to investigate.

15.    On the basis of the video and out of a particular level of concern regarding the several seconds Ms. Zawada took to pause and consider her next act before aggressively grabbing Lyric, the officer charged Ms. Zawada with second degree assault.

16.    Sometime thereafter, Ms. Banks was informed that Ms. Zawada had been terminated as a lunch monitor at Running Brook Elementary School. However, Ms. Zawada was not, in fact, terminated. Rather, she was allegedly put on administrative leave pending the outcome of an external and internal investigation.

17.    Despite the outcome of either investigation, Ms. Zawada was granted liberal access to Running Brook and no steps were taken to ensure that L.B. did not come into contact with her at the school.

18.    Ms. Zawada's presence at Running Brook torments nine-year old L.B. as does Ms. Zawada's son who recently targeted and taunted L.B. and her friends at a trunck-or-treat event at the school by setting out to and effectuating a flagrant heist of the girls' candy which concerned Ms. Banks because it seemed predatory, particularly given that Ms. Zawada's oldest son has at least once been disciplined by HCPSS for racially motivated and discriminatory behavior and/or language.

19.    L.B. is not just scared to attend school, but is also emotionally wounded and constantly concerned that she is unsafe.

20.    L.B. has voiced concerns to her mother that Ms. Zawada is also assassinating her character with the teachers and staff at Running Brook. Although L.B. has experienced and her mother has witnessed frequent and blatant mistreatment of the majority minority population at

Running Brook, as of late, the behavior has become more outrageous and more specifically tailored toward L.B. For example, a few weeks ago, the nurse refused to allow L.B. to use her inhaler after a sporting activity and, but for the insistence of the coach, the nurse would not have permitted her to use the prescribed medication with no explanation for the refusal, simply "no."[2]

21.     The Incident is only one in a long list of ongoing harassing, racist and discriminatory behaviors at Running Brook. Consequently, Ms. Banks has had to take time off from her business tasks to frequent the School, visit Lyric's classroom, and sit with her at lunch. She is also constantly forced to communicate with the School's administration as to her concerns regarding, not only the treatment of Lyric, but in advocacy for the other brown and black children whose right to a free education is being infringed upon and impeded by persistent discriminatory behavior at the school.

22.     For example, on or about October 4, 2019, Ms. Banks witnessed a teacher screaming at the children simply because they were requesting an additional snack. School starts at 9:20 a.m. and fourth grade lunch does not begin until 1:45 p.m. The children are permitted one snack at approximately 11:30 a.m. (which they bring from home) and have twenty (20) minutes to eat their snacks; however, they are not allowed to go back to get an additional snack even within the twenty (20) minute timeframe. The children are left hungry for an additional two (2) hours until lunch time and not permitted an afternoon snack. Then, they are screamed at and disciplined for requesting something else to eat. There have been countless other times that Ms. Banks has witnessed teachers screaming at the students.

23.     The children are also denied access to the bathroom and to water breaks even though their requests are, more often than not, legitimate to the point where children have been

_____

[2] The nurse refused to treat L.B. on more than one occasion.

forced to have accidents and then not permitted to go to the nurse to change and left to sit in the classroom in their soiled clothing.

24.    The brown children are also over-disciplined compared to their white counterparts and are forced to admit to wrongs that they did not actually commit in order to receive discipline.

25.    The brown children are more frequently sent to the office and more often denied access to the bathroom, water, snacks and other basic liberties and freedoms to which all human beings are entitled.

26.    The over-aggressive, discipline-focused, discriminatory manner by which the brown and black students are treated puts the brown and black children in a position where they have to defend themselves to their teachers, causing them to lash out in ways that are uncharacteristic – behaviors which they are again disciplined on the basis of.

27.    The students are also over-diagnosed, over treated for mental health and behavioral issues, and under afforded opportunities for advancement.  In fact, the administrators and teachers have communicated that L.B. is a gifted and talented, advanced communicator and student.  Still, they pressured her mother into agreeing to allow her to work with a behavioral specialist instead of putting her into a gifted and talent program. Both the specialist and Ms. Banks requested that the school test L.B. to make sure that she is on grade-level.  Those requests went un-responded to.  When Ms. Banks further requested information, she was told that L.B. was now being assessed as behind grade level, despite excellent, above-average marks on her report card and satisfactory marks on her most recent progress report (the highest mark available).  Ms. Banks was provided with no information and no means or tools to rely upon in order to bring L.B. up to speed if she is, in fact, behind, rather than ahead of her peers.

28.     There are several other events and repeated acts which have taken and continue to take place at the school and to L.B. which one may consider to be "dog-whistle" racism. That is to say that L.B. understands she is being mistreated when the event occurs and/or that she is witnessing mistreatment, but given her age and experience she does not know why she is being mistreated or understand the emotional impact of the discriminatory environment she is expected, not only to tolerate, but to submit.

## CLAIMS

In consideration of the facts, laws and theories of law enumerated herein, Ms. Banks alleges the following claims:

### COUNTS I, II, III
**Maryland Constitution, Declaration of Rights, Art. 24 and 42 U.S.C. § 1988 Claim for the unlawful deprivation of L.B.'s right to liberty and to be free of unlawful seizures of his freehold, liberties or privileges; Misrepresentation, Fraud and Deceit (w/ Malice); Civil Conspiracy**

*(All Defendants)*

29.     Ms. Banks incorporates the allegations made in Paragraphs 1-28 of this Complaint as if fully stated herein.

30.     Ms. Banks asserts this claim against each Defendant, in both their official and personal capacities.

31.     Ms. Zawada – with little or no verbal request – aggressively grabbed both arms of then-third grade (female) student L.B. in an attempt to move her to an assigned lunch seat. *See id.*

32.     When L.B. resisted the unnecessary, unwarranted, and inappropriate force, Ms. Zawada paused in frustration; double-backed, aggressively grabbed L.B.'s arms a second time; dragged her from the table; swung her around; dragged her to a different lunch table; dropped

her on the bench and walked away without so much as a simple inquiry into her welfare or well-being after the act of aggression (the "Incident"). *See id.*

33. No man (woman or child) ought to be taken or imprisoned or disseized of her freehold, liberties, or privileges. *See* Md. Decl. of Rights, Art. 24.

34. No man (woman or child) out to be deprived of his life, liberty or property, but by the (lawful) judgment of his peers, or by the Law of the land. *See id.*

35. There was no lawful reason to grab and assault L.B. in the manner in which Ms. Zawada did so.

36. The Principal at Running Brook Elementary School, HCPSS administrators, Howard County Police and the Office of the State's Attorney sanctioned Ms. Zawada's action in their failure to take action against Zawada, operating collectively to prevent legal action from being taken against either Ms. Zawada and HCPSS, operating at all times to the benefit of HCPSS and Howard County Government rather than in the best interest of the minor child.

37. The deprivation of L.B.'s rights was committed with malice as it was motivated by an evil motive, the intent to injure, ill will and/or fraud.

38. The deprivation of L.B.'s rights subsequent to the incident amounted to consiperacy as the each of the named Defendants conspired to prevent legal action being effective against Ms. Zawada and HCPSS.

39. As a result of the Defendants' actions, Ms. Banks and L.B. suffered damages, including emotional trauma, distress, physical injuries, and damage to their reputations.

**COUNTS IV and V**
**Assault and Battery**

*(Kelly Zawada)*

11

40.   Ms. Banks incorporates the allegations made in Paragraphs 1-39 of this Complaint as if fully stated herein.

41.   Ms. Banks asserts this claim against all Kelly Zawada, in both her official and personal capacities.

42.   Ms. Zawada – with little or no verbal request – aggressively grabbed both arms of then-third grade (female) student L.B. in an attempt to move her to an assigned lunch seat. *See id.*

43.   When L.B. resisted the unnecessary, unwarranted, and inappropriate force, Ms. Zawada paused in frustration; double-backed, aggressively grabbed L.B.'s arms a second time; dragged her from the table; swung her around; dragged her to a different lunch table; dropped her on the bench and walked away without so much as a simple inquiry into her welfare or well-being after the act of aggression (the "Incident"). *See id.*

44.   The attack was intentional and executed without L.B.'s consent. *See id.*

45.   The attack was both harmful and offensive, causing physical pain, injury and illness, as well as offending L.B.'s reasonable sense of personal dignity. *See id.*

## COUNT VI
### Intentional Infliction of Emotional Distress

*(All Defendants)*

46.   L.B. incorporates the allegations made in Paragraphs 1-45 of this Complaint as if fully stated herein.

47.   L.B. asserts this claim against all Defendants, in both their official and individual capacities.

48.   Ms. Zawada – with little or no verbal request – aggressively grabbed both arms of then-third grade (female) student L.B. in an attempt to move her to an assigned lunch seat. *See id.*

49.    When L.B. resisted the unnecessary, unwarranted, and inappropriate force, Ms. Zawada paused in frustration; double-backed, aggressively grabbed L.B.'s arms a second time; dragged her from the table; swung her around; dragged her to a different lunch table; dropped her on the bench and walked away without so much as a simple inquiry into her welfare or well-being after the act of aggression (the "Incident"). *See id.*

50.    In response, Principal Esposito found Ms. Zawada's behavior to be concerning enough to report the incident to Ms. Banks, but did not follow the procedures outlined in Howard County Public School System ("HCPSS") Policy 1030 ("Policy 1030") which requires that he report any and all child abuse, including child abuse exacted by a school employee to law enforcement and/or the Department of Social Services.

51.    When Ms. Banks viewed the footage the following day, she left Principal Esposito's office and contacted colleague and criminal justice reform advocate Topeka Sam ("Advocate Sam") to explain what she witnessed happen to her daughter at the hands of Ms. Zawada. Advocate Sam told her to call local law enforcement to report the abuse. Ms. Banks did so and local law enforcement reported to Running Brook's campus to investigate.

52.    On the basis of the video and out of a particular level of concern regarding the several seconds Ms. Zawada took to pause and consider her next act before aggressively grabbing Lyric, the officer charged Ms. Zawada with second degree assault.

53.    Sometime thereafter, Ms. Banks was informed that Ms. Zawada had been terminated as a lunch monitor at Running Brook Elementary School. However, Ms. Zawada was not, in fact, terminated. Rather, she was allegedly put on administrative leave pending the outcome of an external and internal investigation.

54.     Despite the outcome of either investigation, Ms. Zawada was granted liberal access to Running Brook and no steps were taken to ensure that L.B. did not come into contact with her at the school.

55.     Ms. Zawada's presence at Running Brook torments nine-year old L.B. as does Ms. Zawada's son who recently targeted and taunted L.B. and her friends at a trunck-or-treat event at the school by setting out to and effectuating a flagrant heist of the girls' candy which concerned Ms. Banks because it seemed predatory, particularly given that Ms. Zawada's oldest son has at least once been disciplined by HCPSS for racially motivated and discriminatory behavior and/or language.

56.     L.B. is not just scared to attend school, but is also emotionally wounded and constantly concerned that she is unsafe.

57.     L.B. has voiced concerns to her mother that Ms. Zawada is also assassinating her character with the teachers and staff at Running Brook. Although L.B. has experienced and her mother has witnessed frequent and blatant mistreatment of the majority minority population at Running Brook, as of late, the behavior has become more outrageous and more specifically tailored toward L.B. For example, a few weeks ago, the nurse refused to allow L.B. to use her inhaler after a sporting activity and, but for the insistence of the coach, the nurse would not have permitted her to use the prescribed medication with no explanation for the refusal, simply "no."[3]

58.     The Incident is only one in a long list of ongoing harassing, racist and discriminatory behaviors at Running Brook. Consequently, Ms. Banks has had to take time off from her business tasks to frequent the School, visit Lyric's classroom, and sit with her at lunch. She is also constantly forced to communicate with the School's administration as to her

---

[3] The nurse refused to treat L.B. on more than one occasion.

concerns regarding, not only the treatment of Lyric, but in advocacy for the other brown and black children whose right to a free education is being infringed upon and impeded by persistent discriminatory behavior at the school.

59. For example, on or about October 4, 2019, Ms. Banks witnessed a teacher screaming at the children simply because they were requesting an additional snack. School starts at 9:20 a.m. and fourth grade lunch does not begin until 1:45 p.m. The children are permitted one snack at approximately 11:30 a.m. (which they bring from home) and have twenty (20) minutes to eat their snacks; however, they are not allowed to go back to get an additional snack even within the twenty (20) minute timeframe. The children are left hungry for an additional two (2) hours until lunch time and not permitted an afternoon snack. Then, they are screamed at and disciplined for requesting something else to eat. There have been countless other times that Ms. Banks has witnessed teachers screaming at the students.

60. The children are also denied access to the bathroom and to water breaks even though their requests are, more often than not, legitimate to the point where children have been forced to have accidents and then not permitted to go to the nurse to change and left to sit in the classroom in their soiled clothing.

61. The brown children are also over-disciplined compared to their white counterparts and are forced to admit to wrongs that they did not actually commit in order to receive discipline.

62. The brown children are more frequently sent to the office and more often denied access to the bathroom, water, snacks and other basic liberties and freedoms to which all human beings are entitled.

63. The over-aggressive, discipline-focused, discriminatory manner by which the brown and black students are treated puts the brown and black children in a position where they

have to defend themselves to their teachers, causing them to lash out in ways that are uncharacteristic – behaviors which they are again disciplined on the basis of.

64.     The students are also over-diagnosed, over treated for mental health and behavioral issues, and under afforded opportunities for advancement. In fact, the administrators and teachers have communicated that L.B. is a gifted and talented, advanced communicator and student. Still, they pressured her mother into agreeing to allow her to work with a behavioral specialist instead of putting her into a gifted and talent program. Both the specialist and Ms. Banks requested that the school test L.B. to make sure that she is on grade-level. Those requests went un-responded to. When Ms. Banks further requested information, she was told that L.B. was now being assessed as behind grade level, despite excellent, above-average marks on her report card and satisfactory marks on her most recent progress report (the highest mark available). Ms. Banks was provided with no information and no means or tools to rely upon in order to bring L.B. up to speed if she is, in fact, behind, rather than ahead of her peers.

65.     There are several other events and repeated acts which have taken and continue to take place at the school and to L.B. which one may consider to be "dog-whistle" racism. That is to say that L.B. understands she is being mistreated when the event occurs and/or that she is witnessing mistreatment, but given her age and experience she does not know why she is being mistreated or understand the emotional impact of the discriminatory environment she is expected, not only to tolerate, but to submit.

66.     The Incident and each subsequent incident, including refusing to prosecute Ms. Zawada, resulted in the infliction of severe emotional distress on L.B. and her mother. The Defendants knew that such distress was substantially certain to result from his actions and acted recklessly and in deliberate disregard of a high probability that emotional distress would follow.

67. As a result of the Defendants' individual and collective tortious actions, L.B. and her mother suffered damages, including emotional trauma, physical injury, distress, and damage to their reputations and the loss of his employment.

## COUNT VII and VIII
## Negligence and Gross Negligence

### (All Defendants)

68. Ms. Banks incorporates the allegations made in Paragraphs 1-67 of this Complaint as if fully stated herein.

69. Ms. Banks asserts this claim against all Defendants, in both their official and personal capacities.

70. Ms. Zawada – with little or no verbal request – aggressively grabbed both arms of then-third grade (female) student L.B. in an attempt to move her to an assigned lunch seat. *See id.*

71. When L.B. resisted the unnecessary, unwarranted, and inappropriate force, Ms. Zawada paused in frustration; double-backed, aggressively grabbed L.B.'s arms a second time; dragged her from the table; swung her around; dragged her to a different lunch table; dropped her on the bench and walked away without so much as a simple inquiry into her welfare or well-being after the act of aggression (the "Incident"). *See id.*

72. In response, Principal Esposito found Ms. Zawada's behavior to be concerning enough to report the incident to Ms. Banks, but did not follow the procedures outlined in Howard County Public School System ("HCPSS") Policy 1030 ("Policy 1030") which requires that he report any and all child abuse, including child abuse exacted by a school employee to law enforcement and/or the Department of Social Services.

73. When Ms. Banks viewed the footage the following day, she left Principal Esposito's office and contacted colleague and criminal justice reform advocate Topeka Sam

("Advocate Sam") to explain what she witnessed happen to her daughter at the hands of Ms. Zawada. Advocate Sam told her to call local law enforcement to report the abuse. Ms. Banks did so and local law enforcement reported to Running Brook's campus to investigate.

74.     On the basis of the video and out of a particular level of concern regarding the several seconds Ms. Zawada took to pause and consider her next act before aggressively grabbing Lyric, the officer charged Ms. Zawada with second degree assault.

75.     Sometime thereafter, Ms. Banks was informed that Ms. Zawada had been terminated as a lunch monitor at Running Brook Elementary School. However, Ms. Zawada was not, in fact, terminated. Rather, she was allegedly put on administrative leave pending the outcome of an external and internal investigation.

76.     Despite the outcome of either investigation, Ms. Zawada was granted liberal access to Running Brook and no steps were taken to ensure that L.B. did not come into contact with her at the school.

77.     Ms. Zawada's presence at Running Brook torments nine-year old L.B.as does Ms. Zawada's son who recently targeted and taunted L.B.and her friends at a trunck-or-treat event at the school by setting out to and effectuating a flagrant heist of the girls' candy which concerned Ms. Banks because it seemed predatory, particularly given that Ms. Zawada's oldest son has at least once been disciplined by HCPSS for racially motivated and discriminatory behavior and/or language.

78.     L.B. is not just scared to attend school, but is also emotionally wounded and constantly concerned that she is unsafe.

79.     L.B. has voiced concerns to her mother that Ms. Zawada is also assassinating her character with the teachers and staff at Running Brook. Although L.B. has experienced and her

mother has witnessed frequent and blatant mistreatment of the majority minority population at Running Brook, as of late, the behavior has become more outrageous and more specifically tailored toward L.B. For example, a few weeks ago, the nurse refused to allow L.B. to use her inhaler after a sporting activity and, but for the insistence of the coach, the nurse would not have permitted her to use the prescribed medication with no explanation for the refusal, simply "no."[4]

80.     The Incident is only one in a long list of ongoing harassing, racist and discriminatory behaviors at Running Brook. Consequently, Ms. Banks has had to take time off from her business tasks to frequent the School, visit Lyric's classroom, and sit with her at lunch. She is also constantly forced to communicate with the School's administration as to her concerns regarding, not only the treatment of Lyric, but in advocacy for the other brown and black children whose right to a free education is being infringed upon and impeded by persistent discriminatory behavior at the school.

81.     For example, on or about October 4, 2019, Ms. Banks witnessed a teacher screaming at the children simply because they were requesting an additional snack. School starts at 9:20 a.m. and fourth grade lunch does not begin until 1:45 p.m. The children are permitted one snack at approximately 11:30 a.m. (which they bring from home) and have twenty (20) minutes to eat their snacks; however, they are not allowed to go back to get an additional snack even within the twenty (20) minute timeframe. The children are left hungry for an additional two (2) hours until lunch time and not permitted an afternoon snack. Then, they are screamed at and disciplined for requesting something else to eat. There have been countless other times that Ms. Banks has witnessed teachers screaming at the students.

---

[4] The nurse refused to treat L.B. on more than one occasion.

82. The children are also denied access to the bathroom and to water breaks even though their requests are, more often than not, legitimate to the point where children have been forced to have accidents and then not permitted to go to the nurse to change and left to sit in the classroom in their soiled clothing.

83. The brown children are also over-disciplined compared to their white counterparts and are forced to admit to wrongs that they did not actually commit in order to receive discipline.

84. The brown children are more frequently sent to the office and more often denied access to the bathroom, water, snacks and other basic liberties and freedoms to which all human beings are entitled.

85. The over-aggressive, discipline-focused, discriminatory manner by which the brown and black students are treated puts the brown and black children in a position where they have to defend themselves to their teachers, causing them to lash out in ways that are uncharacteristic – behaviors which they are again disciplined on the basis of.

86. The students are also over-diagnosed, over treated for mental health and behavioral issues, and under afforded opportunities for advancement. In fact, the administrators and teachers have communicated that L.B. is a gifted and talented, advanced communicator and student. Still, they pressured her mother into agreeing to allow her to work with a behavioral specialist instead of putting her into a gifted and talent program. Both the specialist and Ms. Banks requested that the school test L.B. to make sure that she is on grade-level. Those requests went un-responded to. When Ms. Banks further requested information, she was told that L.B. was now being assessed as behind grade level, despite excellent, above-average marks on her report card and satisfactory marks on her most recent progress report (the highest mark available). Ms. Banks was provided

with no information and no means or tools to rely upon in order to bring L.B. up to speed if she is, in fact, behind, rather than ahead of her peers.

87.     There are several other events and repeated acts which have taken and continue to take place at the school and to L.B. which one may consider to be "dog-whistle" racism. That is to say that L.B. understands she is being mistreated when the event occurs and/or that she is witnessing mistreatment, but given her age and experience she does not know why she is being mistreated or understand the emotional impact of the discriminatory environment she is expected, not only to tolerate, but to submit.

88.     The Incident and each subsequent incident, including refusing to prosecute Ms. Zawad was negligent as to each Defendant.

89.     Defendants had a lawful duty to refrain from committing an assault and/or battery against his person and/or to engage in actions to rectify the behavior, including prosecuting Ms. Zawada.   Defendants actions, collectively and individually, resulted in a breach of the aforementioned duty.

90.     The tortious actions of Defendants L.B. and her mother to suffer damages, including physical injury, emotional trauma, distress, and damage to their reputation, the loss of his employment and loss of wages.

## COUNT IX
### Invasion of Privacy/False Light

*(all Defendants)*

91.     L.B. incorporates the allegations made in Paragraphs 1-90 of this Complaint as if fully stated herein.

92.     Ms. Banks asserts this claim against all Defendants, in both their official and individual capacities.

21

93.     Ms. Zawada – with little or no verbal request – aggressively grabbed both arms of then-third grade (female) student L.B. in an attempt to move her to an assigned lunch seat. *See id.*

94.     When L.B. resisted the unnecessary, unwarranted, and inappropriate force, Ms. Zawada paused in frustration; double-backed, aggressively grabbed L.B.'s arms a second time; dragged her from the table; swung her around; dragged her to a different lunch table; dropped her on the bench and walked away without so much as a simple inquiry into her welfare or well-being after the act of aggression (the "Incident"). *See id.*

95.     In response, Principal Esposito found Ms. Zawada's behavior to be concerning enough to report the incident to Ms. Banks, but did not follow the procedures outlined in Howard County Public School System ("HCPSS") Policy 1030 ("Policy 1030") which requires that he report any and all child abuse, including child abuse exacted by a school employee to law enforcement and/or the Department of Social Services.

96.     When Ms. Banks viewed the footage the following day, she left Principal Esposito's office and contacted colleague and criminal justice reform advocate Topeka Sam ("Advocate Sam") to explain what she witnessed happen to her daughter at the hands of Ms. Zawada. Advocate Sam told her to call local law enforcement to report the abuse. Ms. Banks did so and local law enforcement reported to Running Brook's campus to investigate.

97.     On the basis of the video and out of a particular level of concern regarding the several seconds Ms. Zawada took to pause and consider her next act before aggressively grabbing Lyric, the officer charged Ms. Zawada with second degree assault.

98.     Sometime thereafter, Ms. Banks was informed that Ms. Zawada had been terminated as a lunch monitor at Running Brook Elementary School. However, Ms. Zawada was

not, in fact, terminated. Rather, she was allegedly put on administrative leave pending the outcome of an external and internal investigation.

99.     Despite the outcome of either investigation, Ms. Zawada was granted liberal access to Running Brook and no steps were taken to ensure that L.B. did not come into contact with her at the school.

100.    Ms. Zawada's presence at Running Brook torments nine-year old L.B. as does Ms. Zawada's son who recently targeted and taunted L.B. and her friends at a trunck-or-treat event at the school by setting out to and effectuating a flagrant heist of the girls' candy which concerned Ms. Banks because it seemed predatory, particularly given that Ms. Zawada's oldest son has at least once been disciplined by HCPSS for racially motivated and discriminatory behavior and/or language.

101.    L.B. is not just scared to attend school, but is also emotionally wounded and constantly concerned that she is unsafe.

102.    L.B. has voiced concerns to her mother that Ms. Zawada is also assassinating her character with the teachers and staff at Running Brook. Although L.B. has experienced and her mother has witnessed frequent and blatant mistreatment of the majority minority population at Running Brook, as of late, the behavior has become more outrageous and more specifically tailored toward L.B. For example, a few weeks ago, the nurse refused to allow L.B. to use her inhaler after a sporting activity and, but for the insistence of the coach, the nurse would not have permitted her to use the prescribed medication with no explanation for the refusal, simply "no."[5]

103.    The Incident is only one in a long list of ongoing harassing, racist and discriminatory behaviors at Running Brook. Consequently, Ms. Banks has had to take time off

---

[5] The nurse refused to treat L.B. on more than one occasion.

23

from her business tasks to frequent the School, visit Lyric's classroom, and sit with her at lunch. She is also constantly forced to communicate with the School's administration as to her concerns regarding, not only the treatment of Lyric, but in advocacy for the other brown and black children whose right to a free education is being infringed upon and impeded by persistent discriminatory behavior at the school.

104. For example, on or about October 4, 2019, Ms. Banks witnessed a teacher screaming at the children simply because they were requesting an additional snack. School starts at 9:20 a.m. and fourth grade lunch does not begin until 1:45 p.m. The children are permitted one snack at approximately 11:30 a.m. (which they bring from home) and have twenty (20) minutes to eat their snacks; however, they are not allowed to go back to get an additional snack even within the twenty (20) minute timeframe. The children are left hungry for an additional two (2) hours until lunch time and not permitted an afternoon snack. Then, they are screamed at and disciplined for requesting something else to eat. There have been countless other times that Ms. Banks has witnessed teachers screaming at the students.

105. The children are also denied access to the bathroom and to water breaks even though their requests are, more often than not, legitimate to the point where children have been forced to have accidents and then not permitted to go to the nurse to change and left to sit in the classroom in their soiled clothing.

106. The brown children are also over-disciplined compared to their white counterparts and are forced to admit to wrongs that they did not actually commit in order to receive discipline.

107. The brown children are more frequently sent to the office and more often denied access to the bathroom, water, snacks and other basic liberties and freedoms to which all human beings are entitled.

108. The over-aggressive, discipline-focused, discriminatory manner by which the brown and black students are treated puts the brown and black children in a position where they have to defend themselves to their teachers, causing them to lash out in ways that are uncharacteristic – behaviors which they are again disciplined on the basis of.

109. The students are also over-diagnosed, over treated for mental health and behavioral issues, and under afforded opportunities for advancement. In fact, the administrators and teachers have communicated that L.B. is a gifted and talented, advanced communicator and student. Still, they pressured her mother into agreeing to allow her to work with a behavioral specialist instead of putting her into a gifted and talent program. Both the specialist and Ms. Banks requested that the school test L.B. to make sure that she is on grade-level. Those requests went un-responded to. When Ms. Banks further requested information, she was told that L.B.was now being assessed as behind grade level, despite excellent, above-average marks on her report card and satisfactory marks on her most recent progress report (the highest mark available). Ms. Banks was provided with no information and no means or tools to rely upon in order to bring L.B. up to speed if she is, in fact, behind, rather than ahead of her peers.

110. There are several other events and repeated acts which have taken and continue to take place at the school and to L.B. which one may consider to be "dog-whistle" racism. That is to say that L.B. understands she is being mistreated when the event occurs and/or that she is witnessing mistreatment, but given her age and experience she does not know why she is being mistreated or understand the emotional impact of the discriminatory environment she is expected, not only to tolerate, but to submit.

111. The Incident and each subsequent incident, including refusing to prosecute Ms. Zawada, resulted in the infliction of severe emotional distress on L.B. and her mother. The

Defendants knew that tsuch distress was substantially certain to result from his actions and acted recklessly and in deliberate disregard of a high probability that emotional distress would follow.

112.    Subsequent to the attack, L.B. and Ms. Banks suffered ridicule, taunting, harassment as many HCPSS professionals, parents, neighbors and teachers learned about the Incident through word of mouth and of Ms. Banks pursuit of charges against Ms. Zawada.

113.    As such, the Incident became public.

114.    'It was an invasion of Ms. Banks and L.B.'s privacy by Ms. Zawada, HCPSS and all Defendants because they possessed no authority to assault L.B., to sanction the assault, and/or to fail to prosecute the assault on the basis that Ms. Zawada had endured enough in being terminated (which she was not), placing Ms. Banks and L.B. in a false light and attributing to the public characteristics, conduct and/or beliefs as to them which were false.

115.    The Defendants had actual knowledge and/or a reckless disregard of the falsity.

116.    The manner in which the Defendants publicized the false information would be highly offensive to a reasonable person.

117.    Ms. Banks did not consent to the Defendants' conduct. *See id.*

118.    The Defendants had no right to invade L.B.'s and Ms. Banks privacy.

119.    The Defendants acted with malice in invading Ms. Banks and L.B.'s privacy.

120.    The tortious actions of the Defendants caused L.B. and her mother to suffer damages, including emotional trauma, distress, damage to their reputation and the loss of wages.

**JURY DEMAND**

Ms. Banks respectfully request a jury trial.

**PRAYER FOR RELIEF**

Ms. Banks respectfully requests the following relief:

a.      A Declaratory Judgment forcing the Office of the State's Attorney and State's Attorney Richard Gibson to prosecute Ms. Zawada for the conduct alleged in this Complaint.

b.      A permanent injunction that bars Ms. Zawada from liberal access to the campus of Running Brook Elementary School.

c.      Compensatory damages for the physical injuries, emotional trauma, humiliation, distress, as well as for the loss of wages Ms. Banks suffered in tending to the matters alleged in this Complaint.

d.      Punitive damages for the physical injuries, emotional trauma, humiliation, distress, as well as for the loss of wages Ms. Banks suffered in tending to the matters alleged in this Complaint.

e.      In accordance with 42 U.S.C. § 1988 and/or any other relevant law, an award for costs, expenses and attorney's fees;

f.      Pursuant to MD SB629, the Access to Maryland Courts Act, now in committee, an award for costs, expenses and attorney's fees;

g.      Any other relief as this Honorable Court may deem just and deserving.


Respectfully submitted,

THE LAW OFFICE OF
CHRISTINA J. BOSTICK


____/s/ Christina J. Bostick_____
Christina J. Bostick, Esq.
CPF No.: 1012140073
cjbostick@BostickLawOffice.com
9520 Berger Road
Suite 212

27

Columba, Maryland 21046
1 (855) 267-8425 (t)
(443) 283-4295 (f)

*Attorney for Plaintiff*



**CIRCUIT COURT FOR HOWARD CO
MARYLAND**

8360 Court Avenue
Ellicott City, Maryland 21043

RECEIVED

2020 MAY 27 A 11: 55

E-FILED; Howard Circuit Cou
Submission: 5/15/2020 1:47 P
3-3844
)-313-3822
Juveni.... 10-313-3827
Land Records: 410-313-5850
Calendar Office: 410-313-3575
Family Law: 410-313-2225

**To:** HOWARD COUNTY PUBLIC SCHOOL SYSTEM
S/O: MICHAEL J. MARTIRANO, SUPERINTENDENT OF
SCHOOLS
10910 CLARKSVILLE PIKE
ELLICOTT CITY, MD 21042

Case Number:
Other Reference Number(s):

C-13-CV-19-001189

**MONICA BANKS VS. MICHAEL MARTIRANO, ET AL.**

Issue Date: 5/15/2020

## WRIT OF SUMMONS

You are hereby summoned to file a written response by pleading or motion, within 30 days after service of this summons upon you, in this Court, to the attached complaint filed by:

MONICA BANKS
5345 Columbia Road
Apt H
COLUMBIA, MD 21044

This summons is effective for service only if served within 60 days after the date it is issued.

*Wayne A Robey*

Wayne A. Robey
Clerk of the Circuit Court

To the person summoned:
Failure to file a response within the time allowed may result in a judgment by default or the granting of the relief sought against you.
Personal attendance in court on the day named is NOT required.

Instructions for Service:

1. This summons is effective for service only if served within 60 days after the date issued.
2. Proof of Service shall set out the name of the person served, date and the particular place and manner of service. If service is not made, please state the reasons.
3. Return of served or unserved process shall be made promptly and in accordance with Maryland Rule 2-126.
4. If this notice is served by private process, process server shall file a separate affidavit as required by Maryland Rule 2-126(a).

## SHERIFF'S RETURN
Circuit Court for Howard County

Sheriff fee: _____     By: _____

Served: _____

Time: _____     Date: _____

With the following:

☐ Summons                          ☐ Counter Complaint
☐ Complaint                        ☐ Domestic Case Information Report
☐ Motions                          ☐ Financial Statement
☐ Petition and Show Cause Order    ☐ Other
                                   _____
                                              Please specify

Was unable to serve because:

☐ Moved left no forwarding address    ☐ No such address
☐ Address not in jurisdiction          ☐ Other
                                       _____
                                                 Please specify

Sheriff fee: $ _____     _____
                                          Serving Sheriff's Signature & Date

Instructions to Private Process Server:

1. This Summons is effective for service only if served within 60 days after the date issued.
2. Proof of Service shall set out the name of the person served, date and the particular place and manner of service. If service is not made, please state the reasons.
3. Return of served or unserved process shall be made promptly and in accordance with Rule 2-126.
4. If this summons is served by private process, process server shall file a separate affidavit as required by Rule 2-126(a).

## IN THE CIRCUIT COURT FOR
## HOWARD COUNTY, MARYLAND

**MONICA BANKS** on her own behalf and
on behalf of her minor child L.B.
5345 Columbia Road
Apt. H
Columbia, MD 21044

**Plaintiffs,**

**vs.**

**MICHAEL J. MARTIRANO** in his
capacity as Howard County Public School
System Superintendent
10910 Clarksville Pike
Ellicott City, MD 21042

and

**THE HOWARD COUNTY BOARD OF
EDUCATION**
Serve On:  Mavis Ellis (Chair of the
Board)
10910 Clarksville Pike
Ellicott City, MD 21042

and

**RUNNING BROOK ELEMENTARY
SCHOOL**
Serve On:  Anthony Esposito (Principal)
5215 W Running Brook Rd
Columbia, MD 21044

and

**HOWARD COUNTY PUBLIC
SCHOOL SYSTEM**
Serve On: Michael J. Martirano
(Superintendent of Schools)
10910 Clarksville Pike
Ellicott City, MD 21042

and

Civil Action No.  C-13-CV-19-001189

**COMPLAINT FOR ASSAULT, BATTERY,
AND THE VIOLATION OF VARIOUS
CIVIL RIGHTS**

**Jury Trial Demanded**



1

**ANTHONY ESPOSITO** in both his
capacity as an employee (present or
former) of Howard County Public School
System and in his individual capacity
5215 W. Running Brook Road
Columbia, MD 21044

and

**KELLY MARIE ZAWADA** in both her
capacity as an employee (present or
former) of Howard County School System
and in her individual capacity
5223 Hermit Path
Columbia, MD 21044-0000

and

**RICH GIBSON** in his capacity as Howard
County State's Attorney and his individual
capacity
Carroll Building – Second Floor
3450 Courthouse Drive
Ellicott City, MD 21043

and

**OFFICE OF THE STATE'S
ATTORNEY FOR HOWARD
COUNTY**
Serve On: Rich Gibson (State's Attorney)
3450 Court House Drive
Second (2nd) Floor
Ellicott City, MD 21043

and

**HOWARD COUNTY OFFICE OF
HUMAN RIGHTS**
Serve On: Janssen Evelyn (Acting
Administrator)
9820 Patuxent Woods Drive, Suite 237
Columbia, MD 21046

and

**HOWARD COUNTY POLICE
DEPARTMENT**
**Serve On:** Lisa D. Myers (Chief of Police)
3410 Court House Drive
Ellicott City, MD 21043

and

**UNKNOWN HOWARD COUNTY
POLICE DEPARTMENT POLICE
OFFICER** in both his capacity as a
Howard County Police Officer and his
individual capacity
3410 Court House Drive
Ellicott City, MD 21043

**Defendants.**

Plaintiff, Monica Banks ("Plaintiff" or "Ms. Banks"), on her own behalf and on behalf of

her minor child L.B. for her complaint against the defendants named in the caption above, avers

on knowledge, information and belief:

## STATEMENT OF CASE

1.      This is a civil rights action challenging the policies and practices of the Howard

County Public School System ("HCPSS") as discriminatory in their impact and as discriminatory

in their application as to African American students and parents.

2.      The students at Running Brook Elementary School are majority minority and are

grossly mistreated, including generally being spoken to in such a manner as to presume that they

are slow, developmentally delayed, and/or behaviorally challenged.

3.      This is both a civil rights and tort action challenging the actions taken by lunch

monitor, Kelly Marie Zawada ("Ms. Zawada"), who was then-employed at Running Brook

Elementary School ("Running Brook") as well as its principal, Anthony Esposito ("Principal

Esposito") when Ms. Zawada – with little or no verbal request – aggressively grabbed both arms of then-third grade (female) student L.B. in an attempt to move her to an assigned lunch seat. *See* the video recording of the incident attached hereto as **Exhibit A** (herein referred to as the "Incident").

4.    When L.B. resisted the unnecessary, unwarranted, and inappropriate force, Ms. Zawada paused in frustration; double-backed, aggressively grabbed L.B.'s arms a second time; dragged her from the table; swung her around; dragged her to a different lunch table; dropped her on the bench and walked away without so much as a simple inquiry into her welfare or well-being after the act of aggression (the "Incident"). *See id.*

5.    Although Ms. Banks was told that Ms. Zawada was terminated for the Incident, Ms. Zawada was not, in fact, terminated; rather, Ms. Zawada – a nonexempt part time employee – was treated with all the rights and privileges of an exempt employee under to the bargaining agreement between HCPSS and the Teacher's Union and placed on administrative leave pending the outcome of an investigation. However, HCPSS, did not investigate the Incident, relying instead upon the outcome of an investigation which was supposedly underway by the Howard County Police Department ("HCPD") and the Office of the State's Attorney for Howard County, Maryland ("State's Attorney").

6.    Unknown HCPD Officer did not timely obtain a copy of the video taken in the matter, nor did he properly prepare the charge against Ms. Zawada.

7.    Nevertheless, Ms. Zawada was charged with Second-Degree Assault; however, the Office of the State's Attorney, under the leadership of State's Attorney Rich Gibson refused to prosecute the Second-Degree Assault charge which, admittedly, he

4

understood held validity; rather, it was his belief that Ms. Zawada's termination was enough of a punishment for the illegal act.[1]

8. According to Howard County Policy 1010 ("Policy 1010"):

> The Board of Education is committed to providing an education and work environment that is free from discrimination, fosters equitable opportunities, and values diversity and commonality. The Board prohibits discrimination on the basis of race, color, creed, national origin . . . or socioeconomic status in the educational program, including co-curricular and extra-curricular activities, and in the workplace. The Board recognizes its responsibility to promote worth, dignity, respect and safety and therefore prohibits discrimination through curriculum, instruction, professional development, and resource selection. Employees, students, and third parties share responsibility for the health, safety, and general welfare of students and for creating and ensuring an environment free from discrimination. Employees, students, and third parties may be subject to disciplinary action or consequences for discriminatory behavior even when the behavior does not rise to the level of discrimination as defined.

*See* **Exhibit C**. Policy 1010 is not being honored, nor adhered to in Howard County Public Schools. Rather, there is a pervasive, persistent, illegal and unjust culture of discrimination so deeply-rooted in the Howard County Public School culture that no level of reporting or administrative process can be trusted to remedy the injuries these named and unnamed Plaintiffs are suffering on any average school day.

9. Ms. Banks filed an official complaint of discrimination with the Howard County Office of Human Rights ("OHR") who initially declared that it would file an official charge of discrimination by and through its investigator Davis Ruiz ("Mr. Ruiz"); however, a few days later Mr. Ruiz contacted Ms. Banks by and through her undersigned counsel to inform her that

---

[1] Again, Ms. Zawada was never terminated.

OHR would no longer be pursuing a charge of discrimination because it did not have the power to investigate a complaint alleged regarding a minor child, leaving Ms. Banks with little recourse in resolving the matter short of filing the instant litigation.

## FACTUAL BACKGROUND

10. Ms. Banks and her daughter, L.B., are both African American females.

11. Now, and at the time of the Incident, L.B. was nine (9) years old.

12. One June 10, 2019, Kelly Marie Zawada ("Ms. Zawada"), who was then-employed at Running Brook as a lunch monitor – with little or no verbal request – aggressively grabbed both arms of the then-third grade female in an attempt to move her to an assigned lunch seat. When L.B. resisted the unnecessary, unwarranted, and inappropriate force, Ms. Zawada paused in frustration, double-backed, aggressively grabbed Lyric's arms a second time, dragged her from the table, swung her around, dragged her to a different lunch table, dropped her on the bench and walked away without so much as a simple inquiry into her welfare or well-being after the act of aggression.

13. In response, Principal Esposito found Ms. Zawada's behavior to be concerning enough to report the incident to Ms. Banks, but did not follow the procedures outlined in Howard County Public School System ("HCPSS") Policy 1030 ("Policy 1030") which requires that he report any and all child abuse, including child abuse exacted by a school employee to law enforcement and/or the Department of Social Services.

14. When Ms. Banks viewed the footage the following day, she left Principal Esposito's office and contacted colleague and criminal justice reform advocate Topeka Sam ("Advocate Sam") to explain what she witnessed happen to her daughter at the hands of

Ms. Zawada. Advocate Sam told her to call local law enforcement to report the abuse. Ms. Banks did so and local law enforcement reported to Running Brook's campus to investigate.

15. On the basis of the video and out of a particular level of concern regarding the several seconds Ms. Zawada took to pause and consider her next act before aggressively grabbing Lyric, the officer charged Ms. Zawada with second degree assault.

16. Sometime thereafter, Ms. Banks was informed that Ms. Zawada had been terminated as a lunch monitor at Running Brook Elementary School. However, Ms. Zawada was not, in fact, terminated. Rather, she was allegedly put on administrative leave pending the outcome of an external and internal investigation.

17. Despite the outcome of either investigation, Ms. Zawada was granted liberal access to Running Brook and no steps were taken to ensure that L.B. did not come into contact with her at the school.

18. Ms. Zawada's presence at Running Brook torments nine-year old L.B.as does Ms. Zawada's son who recently targeted and taunted L.B.and her friends at a trunck-or-treat event at the school by setting out to and effectuating a flagrant heist of the girls' candy which concerned Ms. Banks because it seemed predatory, particularly given that Ms. Zawada's oldest son has at least once been disciplined by HCPSS for racially motivated and discriminatory behavior and/or language.

19. L.B. is not just scared to attend school, but is also emotionally wounded and constantly concerned that she is unsafe.

20. L.B. has voiced concerns to her mother that Ms. Zawada is also assassinating her character with the teachers and staff at Running Brook. Although L.B. has experienced and her mother has witnessed frequent and blatant mistreatment of the majority minority population at

Running Brook, as of late, the behavior has become more outrageous and more specifically tailored toward L.B. For example, a few weeks ago, the nurse refused to allow L.B. to use her inhaler after a sporting activity and, but for the insistence of the coach, the nurse would not have permitted her to use the prescribed medication with no explanation for the refusal, simply "no."[2]

21.     The Incident is only one in a long list of ongoing harassing, racist and discriminatory behaviors at Running Brook. Consequently, Ms. Banks has had to take time off from her business tasks to frequent the School, visit Lyric's classroom, and sit with her at lunch. She is also constantly forced to communicate with the School's administration as to her concerns regarding, not only the treatment of Lyric, but in advocacy for the other brown and black children whose right to a free education is being infringed upon and impeded by persistent discriminatory behavior at the school.

22.     For example, on or about October 4, 2019, Ms. Banks witnessed a teacher screaming at the children simply because they were requesting an additional snack. School starts at 9:20 a.m. and fourth grade lunch does not begin until 1:45 p.m. The children are permitted one snack at approximately 11:30 a.m. (which they bring from home) and have twenty (20) minutes to eat their snacks; however, they are not allowed to go back to get an additional snack even within the twenty (20) minute timeframe. The children are left hungry for an additional two (2) hours until lunch time and not permitted an afternoon snack. Then, they are screamed at and disciplined for requesting something else to eat. There have been countless other times that Ms. Banks has witnessed teachers screaming at the students.

23.     The children are also denied access to the bathroom and to water breaks even though their requests are, more often than not, legitimate to the point where children have been

---

[2] The nurse refused to treat L.B. on more than one occasion.

forced to have accidents and then not permitted to go to the nurse to change and left to sit in the classroom in their soiled clothing.

24. The brown children are also over-disciplined compared to their white counterparts and are forced to admit to wrongs that they did not actually commit in order to receive discipline.

25. The brown children are more frequently sent to the office and more often denied access to the bathroom, water, snacks and other basic liberties and freedoms to which all human beings are entitled.

26. The over-aggressive, discipline-focused, discriminatory manner by which the brown and black students are treated puts the brown and black children in a position where they have to defend themselves to their teachers, causing them to lash out in ways that are uncharacteristic – behaviors which they are again disciplined on the basis of.

27. The students are also over-diagnosed, over treated for mental health and behavioral issues, and under afforded opportunities for advancement. In fact, the administrators and teachers have communicated that L.B. is a gifted and talented, advanced communicator and student. Still, they pressured her mother into agreeing to allow her to work with a behavioral specialist instead of putting her into a gifted and talent program. Both the specialist and Ms. Banks requested that the school test L.B. to make sure that she is on grade-level. Those requests went un-responded to. When Ms. Banks further requested information, she was told that L.B. was now being assessed as behind grade level, despite excellent, above-average marks on her report card and satisfactory marks on her most recent progress report (the highest mark available). Ms. Banks was provided with no information and no means or tools to rely upon in order to bring L.B. up to speed if she is, in fact, behind, rather than ahead of her peers.

28. There are several other events and repeated acts which have taken and continue to take place at the school and to L.B. which one may consider to be "dog-whistle" racism. That is to say that L.B. understands she is being mistreated when the event occurs and/or that she is witnessing mistreatment, but given her age and experience she does not know why she is being mistreated or understand the emotional impact of the discriminatory environment she is expected, not only to tolerate, but to submit.

## CLAIMS

In consideration of the facts, laws and theories of law enumerated herein, Ms. Banks alleges the following claims:

### COUNTS I, II, III
**Maryland Constitution, Declaration of Rights, Art. 24 and 42 U.S.C. § 1988 Claim for the unlawful deprivation of L.B.'s right to liberty and to be free of unlawful seizures of his freehold, liberties or privileges; Misrepresentation, Fraud and Deceit (w/ Malice); Civil Conspiracy**

*(All Defendants)*

29. Ms. Banks incorporates the allegations made in Paragraphs 1-28 of this Complaint as if fully stated herein.

30. Ms. Banks asserts this claim against each Defendant, in both their official and personal capacities.

31. Ms. Zawada – with little or no verbal request – aggressively grabbed both arms of then-third grade (female) student L.B. in an attempt to move her to an assigned lunch seat. *See id.*

32. When L.B. resisted the unnecessary, unwarranted, and inappropriate force, Ms. Zawada paused in frustration; double-backed, aggressively grabbed L.B.'s arms a second time; dragged her from the table; swung her around; dragged her to a different lunch table; dropped

her on the bench and walked away without so much as a simple inquiry into her welfare or well-being after the act of aggression (the "Incident"). *See id.*

33. No man (woman or child) ought to be taken or imprisoned or disseized of her freehold, liberties, or privileges. *See* Md. Decl. of Rights, Art. 24.

34. No man (woman or child) out to be deprived of his life, liberty or property, but by the (lawful) judgment of his peers, or by the Law of the land. *See id.*

35. There was no lawful reason to grab and assault L.B. in the manner in which Ms. Zawada did so.

36. The Principal at Running Brook Elementary School, HCPSS administrators, Howard County Police and the Office of the State's Attorney sanctioned Ms. Zawada's action in their failure to take action against Zawada, operating collectively to prevent legal action from being taken against either Ms. Zawada and HCPSS, operating at all times to the benefit of HCPSS and Howard County Government rather than in the best interest of the minor child.

37. The deprivation of L.B.'s rights was committed with malice as it was motivated by an evil motive, the intent to injure, ill will and/or fraud.

38. The deprivation of L.B.'s rights subsequent to the incident amounted to consiperacy as the each of the named Defendants conspired to prevent legal action being effective against Ms. Zawada and HCPSS.

39. As a result of the Defendants' actions, Ms. Banks and L.B. suffered damages, including emotional trauma, distress, physical injuries, and damage to their reputations.

**COUNTS IV and V**
**Assault and Battery**

*(Kelly Zawada)*

11

40.     Ms. Banks incorporates the allegations made in Paragraphs 1-39 of this Complaint as if fully stated herein.

41.     Ms. Banks asserts this claim against all Kelly Zawada, in both her official and personal capacities.

42.     Ms. Zawada – with little or no verbal request – aggressively grabbed both arms of then-third grade (female) student L.B. in an attempt to move her to an assigned lunch seat. *See id.*

43.     When L.B. resisted the unnecessary, unwarranted, and inappropriate force, Ms. Zawada paused in frustration; double-backed, aggressively grabbed L.B.'s arms a second time; dragged her from the table; swung her around; dragged her to a different lunch table; dropped her on the bench and walked away without so much as a simple inquiry into her welfare or well-being after the act of aggression (the "Incident"). *See id.*

44.     The attack was intentional and executed without L.B.'s consent. *See id.*

45.     The attack was both harmful and offensive, causing physical pain, injury and illness, as well as offending L.B.'s reasonable sense of personal dignity. *See id.*

## COUNT VI
### Intentional Infliction of Emotional Distress

*(All Defendants)*

46.     L.B. incorporates the allegations made in Paragraphs 1-45 of this Complaint as if fully stated herein.

47.     L.B. asserts this claim against all Defendants, in both their official and individual capacities.

48.     Ms. Zawada – with little or no verbal request – aggressively grabbed both arms of then-third grade (female) student L.B. in an attempt to move her to an assigned lunch seat. *See id.*

49.     When L.B. resisted the unnecessary, unwarranted, and inappropriate force, Ms. Zawada paused in frustration; double-backed, aggressively grabbed L.B.'s arms a second time; dragged her from the table; swung her around; dragged her to a different lunch table; dropped her on the bench and walked away without so much as a simple inquiry into her welfare or well-being after the act of aggression (the "Incident"). *See id.*

50.     In response, Principal Esposito found Ms. Zawada's behavior to be concerning enough to report the incident to Ms. Banks, but did not follow the procedures outlined in Howard County Public School System ("HCPSS") Policy 1030 ("Policy 1030") which requires that he report any and all child abuse, including child abuse exacted by a school employee to law enforcement and/or the Department of Social Services.

51.     When Ms. Banks viewed the footage the following day, she left Principal Esposito's office and contacted colleague and criminal justice reform advocate Topeka Sam ("Advocate Sam") to explain what she witnessed happen to her daughter at the hands of Ms. Zawada. Advocate Sam told her to call local law enforcement to report the abuse. Ms. Banks did so and local law enforcement reported to Running Brook's campus to investigate.

52.     On the basis of the video and out of a particular level of concern regarding the several seconds Ms. Zawada took to pause and consider her next act before aggressively grabbing Lyric, the officer charged Ms. Zawada with second degree assault.

53.     Sometime thereafter, Ms. Banks was informed that Ms. Zawada had been terminated as a lunch monitor at Running Brook Elementary School. However, Ms. Zawada was not, in fact, terminated. Rather, she was allegedly put on administrative leave pending the outcome of an external and internal investigation.

54. Despite the outcome of either investigation, Ms. Zawada was granted liberal access to Running Brook and no steps were taken to ensure that L.B. did not come into contact with her at the school.

55. Ms. Zawada's presence at Running Brook torments nine-year old L.B. as does Ms. Zawada's son who recently targeted and taunted L.B. and her friends at a trunck-or-treat event at the school by setting out to and effectuating a flagrant heist of the girls' candy which concerned Ms. Banks because it seemed predatory, particularly given that Ms. Zawada's oldest son has at least once been disciplined by HCPSS for racially motivated and discriminatory behavior and/or language.

56. L.B. is not just scared to attend school, but is also emotionally wounded and constantly concerned that she is unsafe.

57. L.B. has voiced concerns to her mother that Ms. Zawada is also assassinating her character with the teachers and staff at Running Brook. Although L.B. has experienced and her mother has witnessed frequent and blatant mistreatment of the majority minority population at Running Brook, as of late, the behavior has become more outrageous and more specifically tailored toward L.B. For example, a few weeks ago, the nurse refused to allow L.B. to use her inhaler after a sporting activity and, but for the insistence of the coach, the nurse would not have permitted her to use the prescribed medication with no explanation for the refusal, simply "no."[3]

58. The Incident is only one in a long list of ongoing harassing, racist and discriminatory behaviors at Running Brook. Consequently, Ms. Banks has had to take time off from her business tasks to frequent the School, visit Lyric's classroom, and sit with her at lunch. She is also constantly forced to communicate with the the School's administration as to her

---

[3] The nurse refused to treat L.B. on more than one occasion.

concerns regarding, not only the treatment of Lyric, but in advocacy for the other brown and black children whose right to a free education is being infringed upon and impeded by persistent discriminatory behavior at the school.

59. For example, on or about October 4, 2019, Ms. Banks witnessed a teacher screaming at the children simply because they were requesting an additional snack. School starts at 9:20 a.m. and fourth grade lunch does not begin until 1:45 p.m. The children are permitted one snack at approximately 11:30 a.m. (which they bring from home) and have twenty (20) minutes to eat their snacks; however, they are not allowed to go back to get an additional snack even within the twenty (20) minute timeframe. The children are left hungry for an additional two (2) hours until lunch time and not permitted an afternoon snack. Then, they are screamed at and disciplined for requesting something else to eat. There have been countless other times that Ms. Banks has witnessed teachers screaming at the students.

60. The children are also denied access to the bathroom and to water breaks even though their requests are, more often than not, legitimate to the point where children have been forced to have accidents and then not permitted to go to the nurse to change and left to sit in the classroom in their soiled clothing.

61. The brown children are also over-disciplined compared to their white counterparts and are forced to admit to wrongs that they did not actually commit in order to receive discipline.

62. The brown children are more frequently sent to the office and more often denied access to the bathroom, water, snacks and other basic liberties and freedoms to which all human beings are entitled.

63. The over-aggressive, discipline-focused, discriminatory manner by which the brown and black students are treated puts the brown and black children in a position where they

have to defend themselves to their teachers, causing them to lash out in ways that are uncharacteristic – behaviors which they are again disciplined on the basis of.

64.     The students are also over-diagnosed, over treated for mental health and behavioral issues, and under afforded opportunities for advancement. In fact, the administrators and teachers have communicated that L.B. is a gifted and talented, advanced communicator and student. Still, they pressured her mother into agreeing to allow her to work with a behavioral specialist instead of putting her into a gifted and talent program. Both the specialist and Ms. Banks requested that the school test L.B. to make sure that she is on grade-level. Those requests went un-responded to. When Ms. Banks further requested information, she was told that L.B.was now being assessed as behind grade level, despite excellent, above-average marks on her report card and satisfactory marks on her most recent progress report (the highest mark available). Ms. Banks was provided with no information and no means or tools to rely upon in order to bring L.B. up to speed if she is, in fact, behind, rather than ahead of her peers.

65.     There are several other events and repeated acts which have taken and continue to take place at the school and to L.B. which one may consider to be "dog-whistle" racism. That is to say that L.B. understands she is being mistreated when the event occurs and/or that she is witnessing mistreatment, but given her age and experience she does not know why she is being mistreated or understand the emotional impact of the discriminatory environment she is expected, not only to tolerate, but to submit.

66.     The Incident and each subsequent incident, including refusing to prosecute Ms. Zawada, resulted in the infliction of severe emotional distress on L.B. and her mother. The Defendants knew that such distress was substantially certain to result from his actions and acted recklessly and in deliberate disregard of a high probability that emotional distress would follow.

16

67.     As a result of the Defendants' individual and collective tortious actions, L.B. and her mother suffered damages, including emotional trauma, physical injury, distress, and damage to their reputations and the loss of his employment.

### COUNT VII and VIII
### Negligence and Gross Negligence

*(All Defendants)*

68.     Ms. Banks incorporates the allegations made in Paragraphs 1-67 of this Complaint as if fully stated herein.

69.     Ms. Banks asserts this claim against all Defendants, in both their official and personal capacities.

70.     Ms. Zawada – with little or no verbal request – aggressively grabbed both arms of then-third grade (female) student L.B. in an attempt to move her to an assigned lunch seat. *See id.*

71.     When L.B. resisted the unnecessary, unwarranted, and inappropriate force, Ms. Zawada paused in frustration; double-backed, aggressively grabbed L.B.'s arms a second time; dragged her from the table; swung her around; dragged her to a different lunch table; dropped her on the bench and walked away without so much as a simple inquiry into her welfare or well-being after the act of aggression (the "Incident"). *See id.*

72.     In response, Principal Esposito found Ms. Zawada's behavior to be concerning enough to report the incident to Ms. Banks, but did not follow the procedures outlined in Howard County Public School System ("HCPSS") Policy 1030 ("Policy 1030") which requires that he report any and all child abuse, including child abuse exacted by a school employee to law enforcement and/or the Department of Social Services.

73.     When Ms. Banks viewed the footage the following day, she left Principal Esposito's office and contacted colleague and criminal justice reform advocate Topeka Sam

("Advocate Sam") to explain what she witnessed happen to her daughter at the hands of Ms. Zawada. Advocate Sam told her to call local law enforcement to report the abuse. Ms. Banks did so and local law enforcement reported to Running Brook's campus to investigate.

74. On the basis of the video and out of a particular level of concern regarding the several seconds Ms. Zawada took to pause and consider her next act before aggressively grabbing Lyric, the officer charged Ms. Zawada with second degree assault.

75. Sometime thereafter, Ms. Banks was informed that Ms. Zawada had been terminated as a lunch monitor at Running Brook Elementary School. However, Ms. Zawada was not, in fact, terminated. Rather, she was allegedly put on administrative leave pending the outcome of an external and internal investigation.

76. Despite the outcome of either investigation, Ms. Zawada was granted liberal access to Running Brook and no steps were taken to ensure that L.B. did not come into contact with her at the school.

77. Ms. Zawada's presence at Running Brook torments nine-year old L.B.as does Ms. Zawada's son who recently targeted and taunted L.B.and her friends at a trunck-or-treat event at the school by setting out to and effectuating a flagrant heist of the girls' candy which concerned Ms. Banks because it seemed predatory, particularly given that Ms. Zawada's oldest son has at least once been disciplined by HCPSS for racially motivated and discriminatory behavior and/or language.

78. L.B. is not just scared to attend school, but is also emotionally wounded and constantly concerned that she is unsafe.

79. L.B. has voiced concerns to her mother that Ms. Zawada is also assassinating her character with the teachers and staff at Running Brook. Although L.B. has experienced and her

mother has witnessed frequent and blatant mistreatment of the majority minority population at Running Brook, as of late, the behavior has become more outrageous and more specifically tailored toward L.B. For example, a few weeks ago, the nurse refused to allow L.B.to use her inhaler after a sporting activity and, but for the insistence of the coach, the nurse would not have permitted her to use the prescribed medication with no explanation for the refusal, simply "no."[4]

80.     The Incident is only one in a long list of ongoing harassing, racist and discriminatory behaviors at Running Brook. Consequently, Ms. Banks has had to take time off from her business tasks to frequent the School, visit Lyric's classroom, and sit with her at lunch. She is also constantly forced to communicate with the School's administration as to her concerns regarding, not only the treatment of Lyric, but in advocacy for the other brown and black children whose right to a free education is being infringed upon and impeded by persistent discriminatory behavior at the school.

81.     For example, on or about October 4, 2019, Ms. Banks witnessed a teacher screaming at the children simply because they were requesting an additional snack. School starts at 9:20 a.m. and fourth grade lunch does not begin until 1:45 p.m. The children are permitted one snack at approximately 11:30 a.m. (which they bring from home) and have twenty (20) minutes to eat their snacks; however, they are not allowed to go back to get an additional snack even within the twenty (20) minute timeframe. The children are left hungry for an additional two (2) hours until lunch time and not permitted an afternoon snack. Then, they are screamed at and disciplined for requesting something else to eat. There have been countless other times that Ms. Banks has witnessed teachers screaming at the students.

---

[4] The nurse refused to treat L.B. on more than one occasion.

82. The children are also denied access to the bathroom and to water breaks even though their requests are, more often than not, legitimate to the point where children have been forced to have accidents and then not permitted to go to the nurse to change and left to sit in the classroom in their soiled clothing.

83. The brown children are also over-disciplined compared to their white counterparts and are forced to admit to wrongs that they did not actually commit in order to receive discipline.

84. The brown children are more frequently sent to the office and more often denied access to the bathroom, water, snacks and other basic liberties and freedoms to which all human beings are entitled.

85. The over-aggressive, discipline-focused, discriminatory manner by which the brown and black students are treated puts the brown and black children in a position where they have to defend themselves to their teachers, causing them to lash out in ways that are uncharacteristic – behaviors which they are again disciplined on the basis of.

86. The students are also over-diagnosed, over treated for mental health and behavioral issues, and under afforded opportunities for advancement. In fact, the administrators and teachers have communicated that L.B. is a gifted and talented, advanced communicator and student. Still, they pressured her mother into agreeing to allow her to work with a behavioral specialist instead of putting her into a gifted and talent program. Both the specialist and Ms. Banks requested that the school test L.B. to make sure that she is on grade-level. Those requests went un-responded to. When Ms. Banks further requested information, she was told that L.B. was now being assessed as behind grade level, despite excellent, above-average marks on her report card and satisfactory marks on her most recent progress report (the highest mark available). Ms. Banks was provided

with no information and no means or tools to rely upon in order to bring L.B. up to speed if she is, in fact, behind, rather than ahead of her peers.

87.     There are several other events and repeated acts which have taken and continue to take place at the school and to L.B. which one may consider to be "dog-whistle" racism. That is to say that L.B. understands she is being mistreated when the event occurs and/or that she is witnessing mistreatment, but given her age and experience she does not know why she is being mistreated or understand the emotional impact of the discriminatory environment she is expected, not only to tolerate, but to submit.

88.     The Incident and each subsequent incident, including refusing to prosecute Ms. Zawad was negligent as to each Defendant.

89.     Defendants had a lawful duty to refrain from committing an assault and/or battery against his person and/or to engage in actions to rectify the behavior, including prosecuting Ms. Zawada.     Defendants actions, collectively and individually, resulted in a breach of the aforementioned duty.

90.     The tortious actions of Defendants L.B. and her mother to suffer damages, including physical injury, emotional trauma, distress, and damage to their reputation, the loss of his employment and loss of wages.

## COUNT IX
### Invasion of Privacy/False Light

*(all Defendants)*

91.     L.B. incorporates the allegations made in Paragraphs 1-90 of this Complaint as if fully stated herein.

92.     Ms. Banks asserts this claim against all Defendants, in both their official and individual capacities.

93. Ms. Zawada – with little or no verbal request – aggressively grabbed both arms of then-third grade (female) student L.B. in an attempt to move her to an assigned lunch seat. *See id.*

94. When L.B. resisted the unnecessary, unwarranted, and inappropriate force, Ms. Zawada paused in frustration; double-backed, aggressively grabbed L.B.'s arms a second time; dragged her from the table; swung her around; dragged her to a different lunch table; dropped her on the bench and walked away without so much as a simple inquiry into her welfare or well-being after the act of aggression (the "Incident"). *See id.*

95. In response, Principal Esposito found Ms. Zawada's behavior to be concerning enough to report the incident to Ms. Banks, but did not follow the procedures outlined in Howard County Public School System ("HCPSS") Policy 1030 ("Policy 1030") which requires that he report any and all child abuse, including child abuse exacted by a school employee to law enforcement and/or the Department of Social Services.

96. When Ms. Banks viewed the footage the following day, she left Principal Esposito's office and contacted colleague and criminal justice reform advocate Topeka Sam ("Advocate Sam") to explain what she witnessed happen to her daughter at the hands of Ms. Zawada. Advocate Sam told her to call local law enforcement to report the abuse. Ms. Banks did so and local law enforcement reported to Running Brook's campus to investigate.

97. On the basis of the video and out of a particular level of concern regarding the several seconds Ms. Zawada took to pause and consider her next act before aggressively grabbing Lyric, the officer charged Ms. Zawada with second degree assault.

98. Sometime thereafter, Ms. Banks was informed that Ms. Zawada had been terminated as a lunch monitor at Running Brook Elementary School. However, Ms. Zawada was

not, in fact, terminated. Rather, she was allegedly put on administrative leave pending the outcome of an external and internal investigation.

99.     Despite the outcome of either investigation, Ms. Zawada was granted liberal access to Running Brook and no steps were taken to ensure that L.B. did not come into contact with her at the school.

100.     Ms. Zawada's presence at Running Brook torments nine-year old L.B.as does Ms. Zawada's son who recently targeted and taunted L.B.and her friends at a trunck-or-treat event at the school by setting out to and effectuating a flagrant heist of the girls' candy which concerned Ms. Banks because it seemed predatory, particularly given that Ms. Zawada's oldest son has at least once been disciplined by HCPSS for racially motivated and discriminatory behavior and/or language.

101.     L.B. is not just scared to attend school, but is also emotionally wounded and constantly concerned that she is unsafe.

102.     L.B. has voiced concerns to her mother that Ms. Zawada is also assassinating her character with the teachers and staff at Running Brook. Although L.B. has experienced and her mother has witnessed frequent and blatant mistreatment of the majority minority population at Running Brook, as of late, the behavior has become more outrageous and more specifically tailored toward L.B. For example, a few weeks ago, the nurse refused to allow L.B.to use her inhaler after a sporting activity and, but for the insistence of the coach, the nurse would not have permitted her to use the prescribed medication with no explanation for the refusal, simply "no."[5]

103.     The Incident is only one in a long list of ongoing harassing, racist and discriminatory behaviors at Running Brook. Consequently, Ms. Banks has had to take time off

---

[5] The nurse refused to treat L.B. on more than one occasion.

from her business tasks to frequent the School, visit Lyric's classroom, and sit with her at lunch. She is also constantly forced to communicate with the School's administration as to her concerns regarding, not only the treatment of Lyric, but in advocacy for the other brown and black children whose right to a free education is being infringed upon and impeded by persistent discriminatory behavior at the school.

104.    For example, on or about October 4, 2019, Ms. Banks witnessed a teacher screaming at the children simply because they were requesting an additional snack. School starts at 9:20 a.m. and fourth grade lunch does not begin until 1:45 p.m. The children are permitted one snack at approximately 11:30 a.m. (which they bring from home) and have twenty (20) minutes to eat their snacks; however, they are not allowed to go back to get an additional snack even within the twenty (20) minute timeframe. The children are left hungry for an additional two (2) hours until lunch time and not permitted an afternoon snack. Then, they are screamed at and disciplined for requesting something else to eat. There have been countless other times that Ms. Banks has witnessed teachers screaming at the students.

105.    The children are also denied access to the bathroom and to water breaks even though their requests are, more often than not, legitimate to the point where children have been forced to have accidents and then not permitted to go to the nurse to change and left to sit in the classroom in their soiled clothing.

106.    The brown children are also over-disciplined compared to their white counterparts and are forced to admit to wrongs that they did not actually commit in order to receive discipline.

107.    The brown children are more frequently sent to the office and more often denied access to the bathroom, water, snacks and other basic liberties and freedoms to which all human beings are entitled.

108. The over-aggressive, discipline-focused, discriminatory manner by which the brown and black students are treated puts the brown and black children in a position where they have to defend themselves to their teachers, causing them to lash out in ways that are uncharacteristic – behaviors which they are again disciplined on the basis of.

109. The students are also over-diagnosed, over treated for mental health and behavioral issues, and under afforded opportunities for advancement. In fact, the administrators and teachers have communicated that L.B. is a gifted and talented, advanced communicator and student. Still, they pressured her mother into agreeing to allow her to work with a behavioral specialist instead of putting her into a gifted and talent program. Both the specialist and Ms. Banks requested that the school test L.B. to make sure that she is on grade-level. Those requests went un-responded to. When Ms. Banks further requested information, she was told that L.B. was now being assessed as behind grade level, despite excellent, above-average marks on her report card and satisfactory marks on her most recent progress report (the highest mark available). Ms. Banks was provided with no information and no means or tools to rely upon in order to bring L.B. up to speed if she is, in fact, behind, rather than ahead of her peers.

110. There are several other events and repeated acts which have taken and continue to take place at the school and to L.B. which one may consider to be "dog-whistle" racism. That is to say that L.B. understands she is being mistreated when the event occurs and/or that she is witnessing mistreatment, but given her age and experience she does not know why she is being mistreated or understand the emotional impact of the discriminatory environment she is expected, not only to tolerate, but to submit.

111. The Incident and each subsequent incident, including refusing to prosecute Ms. Zawada, resulted in the infliction of severe emotional distress on L.B. and her mother. The

Defendants knew that tsuch distress was substantially certain to result from his actions and acted recklessly and in deliberate disregard of a high probability that emotional distress would follow.

112.    Subsequent to the attack, L.B. and Ms. Banks suffered ridicule, taunting, harassment as many HCPSS professionals, parents, neighbors and teachers learned about the Incident through word of mouth and of Ms. Banks pursuit of charges against Ms. Zawada.

113.    As such, the Incident became public.

114.    'It was an invasion of Ms. Banks and L.B.'s privacy by Ms. Zawada, HCPSS and all Defendants because they possessed no authority to assault L.B., to sanction the assault, and/or to fail to prosecute the assault on the basis that Ms. Zawada had endured enough in being terminated (which she was not), placing Ms. Banks and L.B. in a false light and attributing to the public characteristics, conduct and/or beliefs as to them which were false.

115.    The Defendants had actual knowledge and/or a reckless disregard of the falsity.

116.    The manner in which the Defendants publicized the false information would be highly offensive to a reasonable person.

117.    Ms. Banks did not consent to the Defendants' conduct. *See id.*

118.    The Defendants had no right to invade L.B.'s and Ms. Banks privacy.

119.    The Defendants acted with malice in invading Ms. Banks and L.B.'s privacy.

120.    The tortious actions of the Defendants caused L.B. and her mother to suffer damages, including emotional trauma, distress, damage to their reputation and the loss of wages.

**JURY DEMAND**

Ms. Banks respectfully request a jury trial.

**PRAYER FOR RELIEF**

Ms. Banks respectfully requests the following relief:

a.     A Declaratory Judgment forcing the Office of the State's Attorney and State's Attorney Richard Gibson to prosecute Ms. Zawada for the conduct alleged in this Complaint.

b.     A permanent injunction that bars Ms. Zawada from liberal access to the campus of Running Brook Elementary School.

c.     Compensatory damages for the physical injuries, emotional trauma, humiliation, distress, as well as for the loss of wages Ms. Banks suffered in tending to the matters alleged in this Complaint.

d.     Punitive damages for the physical injuries, emotional trauma, humiliation, distress, as well as for the loss of wages Ms. Banks suffered in tending to the matters alleged in this Complaint.

e.     In accordance with 42 U.S.C. § 1988 and/or any other relevant law, an award for costs, expenses and attorney's fees;

f.     Pursuant to MD SB629, the Access to Maryland Courts Act, now in committee, an award for costs, expenses and attorney's fees;

g.     Any other relief as this Honorable Court may deem just and deserving.


Respectfully submitted,

THE LAW OFFICE OF
CHRISTINA J. BOSTICK


   /s/ Christina J. Bostick_____
Christina J. Bostick, Esq.
CPF No.: 1012140073
*cjbostick@BostickLawOffice.com*
9520 Berger Road
Suite 212

Columba, Maryland 21046
1 (855) 267-8425 (t)
(443) 283-4295 (f)

*Attorney for Plaintiff*



**CIRCUIT COURT FOR HOWARD COUNTY,**
**MARYLAND**
8360 Court Avenue
Ellicott City, Maryland 21043

Docket: 5/15/2020 1:47 PM; Submission: 5/15/2020 1:47 PM

E-FILED; Howard Circuit Co
Main Submission: 5/15/2020 1:47

Civil: 410-313-3844
Criminal: 410-313-3822
Juvenile: 410-313-3827
Land Records: 410-313-5850
Calendar Office: 410-313-3575
Family Law: 410-313-2225

RECEIVED

2020 MAY 27 P 12: 28

**To:** HOWARD COUNTY BOARD OF EDUCATION
S/O: MAVIS ELLIS, CHAIR OF THE BOARD
10910 CLARKSVILLE PIKE
ELLICOTT CITY, MD 21042

|  |  |
|---|---|
| **Case Number:** | C-13-CV-19-001189 |
| **Other Reference Number(s):** | |

**MONICA BANKS VS. MICHAEL MARTIRANO, ET AL.**

Issue Date: 5/15/2020

## WRIT OF SUMMONS

You are hereby summoned to file a written response by pleading or motion, within 30 days after service of this summons upon you, in this Court, to the attached complaint filed by:

MONICA BANKS
5345 Columbia Road
Apt H
COLUMBIA, MD 21044

This summons is effective for service only if served within 60 days after the date it is issued.

*Wayne A. Robey*

Wayne A. Robey
Clerk of the Circuit Court

To the person summoned:
Failure to file a response within the time allowed may result in a judgment by default or the granting of the relief sought against you.
Personal attendance in court on the day named is NOT required.

Instructions for Service:

1. This summons is effective for service only if served within 60 days after the date issued.
2. Proof of Service shall set out the name of the person served, date and the particular place and manner of service. If service is not made, please state the reasons.
3. Return of served or unserved process shall be made promptly and in accordance with Maryland Rule 2-126.
4. If this notice is served by private process, process server shall file a separate affidavit as required by Maryland Rule 2-126(a).

## SHERIFF'S RETURN
### Circuit Court for Howard County

Sheriff fee: _____    By: _____

Served: _____

Time: _____    Date: _____

With the following:

☐ Summons                           ☐ Counter Complaint
☐ Complaint                         ☐ Domestic Case Information Report
☐ Motions                           ☐ Financial Statement
☐ Petition and Show Cause Order     ☐ Other _____
                                            Please specify

Was unable to serve because:

☐ Moved left no forwarding address  ☐ No such address
☐ Address not in jurisdiction       ☐ Other _____
                                            Please specify

Sheriff fee: $ _____    _____
                                          Serving Sheriff's Signature & Date

Instructions to Private Process Server:

1. This Summons is effective for service only if served within 60 days after the date issued.
2. Proof of Service shall set out the name of the person served, date and the particular place and manner of service. If service is not made, please state the reasons.
3. Return of served or unserved process shall be made promptly and in accordance with Rule 2-126.
4. If this summons is served by private process, process server shall file a separate affidavit as required by Rule 2-126(a).

## IN THE CIRCUIT COURT FOR
## HOWARD COUNTY, MARYLAND

**MONICA BANKS** on her own behalf and
on behalf of her minor child L.B.
5345 Columbia Road
Apt. H
Columbia, MD 21044

      **Plaintiffs,**

  **vs.**

**MICHAEL J. MARTIRANO** in his
capacity as Howard County Public School
System Superintendent
10910 Clarksville Pike
Ellicott City, MD 21042

and

**THE HOWARD COUNTY BOARD OF
EDUCATION**
Serve On:  Mavis Ellis (Chair of the
Board)
10910 Clarksville Pike
Ellicott City, MD 21042

and

**RUNNING BROOK ELEMENTARY
SCHOOL**
Serve On:  Anthony Esposito (Principal)
5215 W Running Brook Rd
Columbia, MD 21044

and

**HOWARD COUNTY PUBLIC
SCHOOL SYSTEM**
Serve On: Michael J. Martirano
(Superintendent of Schools)
10910 Clarksville Pike
Ellicott City, MD 21042

and

Civil Action No. ___C-13-CV-19-001189___

**COMPLAINT FOR ASSAULT, BATTERY,
AND THE VIOLATION OF VARIOUS
CIVIL RIGHTS**

**Jury Trial Demanded**



**ANTHONY ESPOSITO** in both his
capacity as an employee (present or
former) of Howard County Public School
System and in his individual capacity
5215 W. Running Brook Road
Columbia, MD 21044

and

**KELLY MARIE ZAWADA** in both her
capacity as an employee (present or
former) of Howard County School System
and in her individual capacity
5223 Hermit Path
Columbia, MD 21044-0000

and

**RICH GIBSON** in his capacity as Howard
County State's Attorney and his individual
capacity
Carroll Building – Second Floor
3450 Courthouse Drive
Ellicott City, MD 21043

and

**OFFICE OF THE STATE'S
ATTORNEY FOR HOWARD
COUNTY**
Serve On: Rich Gibson (State's Attorney)
3450 Court House Drive
Second (2nd) Floor
Ellicott City, MD 21043

and

**HOWARD COUNTY OFFICE OF
HUMAN RIGHTS**
Serve On: Janssen Evelyn (Acting
Administrator)
9820 Patuxent Woods Drive, Suite 237
Columbia, MD 21046

and

**HOWARD COUNTY POLICE
DEPARTMENT**
**Serve On:** Lisa D. Myers (Chief of Police)
3410 Court House Drive
Ellicott City, MD 21043

and

**UNKNOWN HOWARD COUNTY
POLICE DEPARTMENT POLICE
OFFICER** in both his capacity as a
Howard County Police Officer and his
individual capacity
3410 Court House Drive
Ellicott City, MD 21043

       **Defendants.**

    Plaintiff, Monica Banks ("Plaintiff" or "Ms. Banks"), on her own behalf and on behalf of

her minor child L.B. for her complaint against the defendants named in the caption above, avers

on knowledge, information and belief:

## STATEMENT OF CASE

    1.    This is a civil rights action challenging the policies and practices of the Howard

County Public School System ("HCPSS") as discriminatory in their impact and as discriminatory

in their application as to African American students and parents.

    2.    The students at Running Brook Elementary School are majority minority and are

grossly mistreated, including generally being spoken to in such a manner as to presume that they

are slow, developmentally delayed, and/or behaviorally challenged.

    3.    This is both a civil rights and tort action challenging the actions taken by lunch

monitor, Kelly Marie Zawada ("Ms. Zawada"), who was then-employed at Running Brook

Elementary School ("Running Brook") as well as its principal, Anthony Esposito ("Principal

Esposito") when Ms. Zawada – with little or no verbal request – aggressively grabbed both arms of then-third grade (female) student L.B. in an attempt to move her to an assigned lunch seat. *See* the video recording of the incident attached hereto as **Exhibit A** (herein referred to as the "Incident").

4.      When L.B. resisted the unnecessary, unwarranted, and inappropriate force, Ms. Zawada paused in frustration; double-backed, aggressively grabbed L.B.'s arms a second time; dragged her from the table; swung her around; dragged her to a different lunch table; dropped her on the bench and walked away without so much as a simple inquiry into her welfare or well-being after the act of aggression (the "Incident"). *See id.*

5.      Although Ms. Banks was told that Ms. Zawada was terminated for the Incident, Ms. Zawada was not, in fact, terminated; rather, Ms. Zawada – a nonexempt part time employee – was treated with all the rights and privileges of an exempt employee under to the bargaining agreement between HCPSS and the Teacher's Union and placed on administrative leave pending the outcome of an investigation. However, HCPSS, did not investigate the Incident, relying instead upon the outcome of an investigation which was supposedly underway by the Howard County Police Department ("HCPD") and the Office of the State's Attorney for Howard County, Maryland ("State's Attorney").

6.      Unknown HCPD Officer did not timely obtain a copy of the video taken in the matter, nor did he properly prepare the charge against Ms. Zawada.

7.      Nevertheless, Ms. Zawada was charged with Second-Degree Assault; however, the Office of the State's Attorney, under the leadership of State's Attorney Rich Gibson refused to prosecute the Second-Degree Assault charge which, admittedly, he

understood held validity; rather, it was his belief that Ms. Zawada's termination was enough of a punishment for the illegal act.[1]

8.    According to Howard County Policy 1010 ("Policy 1010"):

The Board of Education is committed to providing an education and work environment that is free from discrimination, fosters equitable opportunities, and values diversity and commonality. The Board prohibits discrimination on the basis of race, color, creed, national origin . . . or socioeconomic status in the educational program, including co-curricular and extra-curricular activities, and in the workplace. The Board recognizes its responsibility to promote worth, dignity, respect and safety and therefore prohibits discrimination through curriculum, instruction, professional development, and resource selection. Employees, students, and third parties share responsibility for the health, safety, and general welfare of students and for creating and ensuring an environment free from discrimination. Employees, students, and third parties may be subject to disciplinary action or consequences for discriminatory behavior even when the behavior does not rise to the level of discrimination as defined.

*See* **Exhibit C**. Policy 1010 is not being honored, nor adhered to in Howard County Public Schools. Rather, there is a pervasive, persistent, illegal and unjust culture of discrimination so deeply-rooted in the Howard County Public School culture that no level of reporting or administrative process can be trusted to remedy the injuries these named and unnamed Plaintiffs are suffering on any average school day.

9.    Ms. Banks filed an official complaint of discrimination with the Howard County Office of Human Rights ("OHR") who initially declared that it would file an official charge of discrimination by and through its investigator Davis Ruiz ("Mr. Ruiz"); however, a few days later Mr. Ruiz contacted Ms. Banks by and through her undersigned counsel to inform her that

---

[1] Again, Ms. Zawada was never terminated.

OHR would no longer be pursuing a charge of discrimination because it did not have the power to investigate a complaint alleged regarding a minor child, leaving Ms. Banks with little recourse in resolving the matter short of filing the instant litigation.

## FACTUAL BACKGROUND

10.     Ms. Banks and her daughter, L.B., are both African American females.

11.     Now, and at the time of the Incident, L.B. was nine (9) years old.

12.     One June 10, 2019, Kelly Marie Zawada ("Ms. Zawada"), who was then-employed at Running Brook as a lunch monitor – with little or no verbal request – aggressively grabbed both arms of the then-third grade female in an attempt to move her to an assigned lunch seat. When L.B. resisted the unnecessary, unwarranted, and inappropriate force, Ms. Zawada paused in frustration, double-backed, aggressively grabbed Lyric's arms a second time, dragged her from the table, swung her around, dragged her to a different lunch table, dropped her on the bench and walked away without so much as a simple inquiry into her welfare or well-being after the act of aggression.

13.     In response, Principal Esposito found Ms. Zawada's behavior to be concerning enough to report the incident to Ms. Banks, but did not follow the procedures outlined in Howard County Public School System ("HCPSS") Policy 1030 ("Policy 1030") which requires that he report any and all child abuse, including child abuse exacted by a school employee to law enforcement and/or the Department of Social Services.

14.     When Ms. Banks viewed the footage the following day, she left Principal Esposito's office and contacted colleague and criminal justice reform advocate Topeka Sam ("Advocate Sam") to explain what she witnessed happen to her daughter at the hands of

Ms. Zawada. Advocate Sam told her to call local law enforcement to report the abuse. Ms. Banks did so and local law enforcement reported to Running Brook's campus to investigate.

15. On the basis of the video and out of a particular level of concern regarding the several seconds Ms. Zawada took to pause and consider her next act before aggressively grabbing Lyric, the officer charged Ms. Zawada with second degree assault.

16. Sometime thereafter, Ms. Banks was informed that Ms. Zawada had been terminated as a lunch monitor at Running Brook Elementary School. However, Ms. Zawada was not, in fact, terminated. Rather, she was allegedly put on administrative leave pending the outcome of an external and internal investigation.

17. Despite the outcome of either investigation, Ms. Zawada was granted liberal access to Running Brook and no steps were taken to ensure that L.B. did not come into contact with her at the school.

18. Ms. Zawada's presence at Running Brook torments nine-year old L.B. as does Ms. Zawada's son who recently targeted and taunted L.B. and her friends at a trunck-or-treat event at the school by setting out to and effectuating a flagrant heist of the girls' candy which concerned Ms. Banks because it seemed predatory, particularly given that Ms. Zawada's oldest son has at least once been disciplined by HCPSS for racially motivated and discriminatory behavior and/or language.

19. L.B. is not just scared to attend school, but is also emotionally wounded and constantly concerned that she is unsafe.

20. L.B. has voiced concerns to her mother that Ms. Zawada is also assassinating her character with the teachers and staff at Running Brook. Although L.B. has experienced and her mother has witnessed frequent and blatant mistreatment of the majority minority population at

Running Brook, as of late, the behavior has become more outrageous and more specifically tailored toward L.B. For example, a few weeks ago, the nurse refused to allow L.B. to use her inhaler after a sporting activity and, but for the insistence of the coach, the nurse would not have permitted her to use the prescribed medication with no explanation for the refusal, simply "no."[2]

21. The Incident is only one in a long list of ongoing harassing, racist and discriminatory behaviors at Running Brook. Consequently, Ms. Banks has had to take time off from her business tasks to frequent the School, visit Lyric's classroom, and sit with her at lunch. She is also constantly forced to communicate with the School's administration as to her concerns regarding, not only the treatment of Lyric, but in advocacy for the other brown and black children whose right to a free education is being infringed upon and impeded by persistent discriminatory behavior at the school.

22. For example, on or about October 4, 2019, Ms. Banks witnessed a teacher screaming at the children simply because they were requesting an additional snack. School starts at 9:20 a.m. and fourth grade lunch does not begin until 1:45 p.m. The children are permitted one snack at approximately 11:30 a.m. (which they bring from home) and have twenty (20) minutes to eat their snacks; however, they are not allowed to go back to get an additional snack even within the twenty (20) minute timeframe. The children are left hungry for an additional two (2) hours until lunch time and not permitted an afternoon snack. Then, they are screamed at and disciplined for requesting something else to eat. There have been countless other times that Ms. Banks has witnessed teachers screaming at the students.

23. The children are also denied access to the bathroom and to water breaks even though their requests are, more often than not, legitimate to the point where children have been

_____

[2] The nurse refused to treat L.B. on more than one occasion.

forced to have accidents and then not permitted to go to the nurse to change and left to sit in the classroom in their soiled clothing.

24. The brown children are also over-disciplined compared to their white counterparts and are forced to admit to wrongs that they did not actually commit in order to receive discipline.

25. The brown children are more frequently sent to the office and more often denied access to the bathroom, water, snacks and other basic liberties and freedoms to which all human beings are entitled.

26. The over-aggressive, discipline-focused, discriminatory manner by which the brown and black students are treated puts the brown and black children in a position where they have to defend themselves to their teachers, causing them to lash out in ways that are uncharacteristic – behaviors which they are again disciplined on the basis of.

27. The students are also over-diagnosed, over treated for mental health and behavioral issues, and under afforded opportunities for advancement. In fact, the administrators and teachers have communicated that L.B. is a gifted and talented, advanced communicator and student. Still, they pressured her mother into agreeing to allow her to work with a behavioral specialist instead of putting her into a gifted and talent program. Both the specialist and Ms. Banks requested that the school test L.B. to make sure that she is on grade-level. Those requests went un-responded to. When Ms. Banks further requested information, she was told that L.B. was now being assessed as behind grade level, despite excellent, above-average marks on her report card and satisfactory marks on her most recent progress report (the highest mark available). Ms. Banks was provided with no information and no means or tools to rely upon in order to bring L.B. up to speed if she is, in fact, behind, rather than ahead of her peers.

28.     There are several other events and repeated acts which have taken and continue to take place at the school and to L.B. which one may consider to be "dog-whistle" racism. That is to say that L.B. understands she is being mistreated when the event occurs and/or that she is witnessing mistreatment, but given her age and experience she does not know why she is being mistreated or understand the emotional impact of the discriminatory environment she is expected, not only to tolerate, but to submit.

## CLAIMS

In consideration of the facts, laws and theories of law enumerated herein, Ms. Banks alleges the following claims:

### COUNTS I, II, III
**Maryland Constitution, Declaration of Rights, Art. 24 and 42 U.S.C. § 1988 Claim for the unlawful deprivation of L.B.'s right to liberty and to be free of unlawful seizures of his freehold, liberties or privileges; Misrepresentation, Fraud and Deceit (w/ Malice); Civil Conspiracy**

*(All Defendants)*

29.     Ms. Banks incorporates the allegations made in Paragraphs 1-28 of this Complaint as if fully stated herein.

30.     Ms. Banks asserts this claim against each Defendant, in both their official and personal capacities.

31.     Ms. Zawada – with little or no verbal request – aggressively grabbed both arms of then-third grade (female) student L.B. in an attempt to move her to an assigned lunch seat. *See id.*

32.     When L.B. resisted the unnecessary, unwarranted, and inappropriate force, Ms. Zawada paused in frustration; double-backed, aggressively grabbed L.B.'s arms a second time; dragged her from the table; swung her around; dragged her to a different lunch table; dropped

her on the bench and walked away without so much as a simple inquiry into her welfare or well-being after the act of aggression (the "Incident"). *See id.*

33.    No man (woman or child) ought to be taken or imprisoned or disseized of her freehold, liberties, or privileges. *See* Md. Decl. of Rights, Art. 24.

34.    No man (woman or child) out to be deprived of his life, liberty or property, but by the (lawful) judgment of his peers, or by the Law of the land. *See id.*

35.    There was no lawful reason to grab and assault L.B. in the manner in which Ms. Zawada did so.

36.    The Principal at Running Brook Elementary School, HCPSS administrators, Howard County Police and the Office of the State's Attorney sanctioned Ms. Zawada's action in their failure to take action against Zawada, operating collectively to prevent legal action from being taken against either Ms. Zawada and HCPSS, operating at all times to the benefit of HCPSS and Howard County Government rather than in the best interest of the minor child.

37.    The deprivation of L.B.'s rights was committed with malice as it was motivated by an evil motive, the intent to injure, ill will and/or fraud.

38.    The deprivation of L.B.'s rights subsequent to the incident amounted to consiperacy as the each of the named Defendants conspired to prevent legal action being effective against Ms. Zawada and HCPSS.

39.    As a result of the Defendants' actions, Ms. Banks and L.B. suffered damages, including emotional trauma, distress, physical injuries, and damage to their reputations.

**COUNTS IV and V**
**Assault and Battery**

*(Kelly Zawada)*

11

40.    Ms. Banks incorporates the allegations made in Paragraphs 1-39 of this Complaint as if fully stated herein.

41.    Ms. Banks asserts this claim against all Kelly Zawada, in both her official and personal capacities.

42.    Ms. Zawada – with little or no verbal request – aggressively grabbed both arms of then-third grade (female) student L.B. in an attempt to move her to an assigned lunch seat. *See id.*

43.    When L.B. resisted the unnecessary, unwarranted, and inappropriate force, Ms. Zawada paused in frustration; double-backed, aggressively grabbed L.B.'s arms a second time; dragged her from the table; swung her around; dragged her to a different lunch table; dropped her on the bench and walked away without so much as a simple inquiry into her welfare or well-being after the act of aggression (the "Incident"). *See id.*

44.    The attack was intentional and executed without L.B.'s consent. *See id.*

45.    The attack was both harmful and offensive, causing physical pain, injury and illness, as well as offending L.B.'s reasonable sense of personal dignity. *See id.*

## COUNT VI
### Intentional Infliction of Emotional Distress

*(All Defendants)*

46.    L.B. incorporates the allegations made in Paragraphs 1-45 of this Complaint as if fully stated herein.

47.    L.B. asserts this claim against all Defendants, in both their official and individual capacities.

48.    Ms. Zawada – with little or no verbal request – aggressively grabbed both arms of then-third grade (female) student L.B. in an attempt to move her to an assigned lunch seat. *See id.*

12

49.    When L.B. resisted the unnecessary, unwarranted, and inappropriate force, Ms. Zawada paused in frustration; double-backed, aggressively grabbed L.B.'s arms a second time; dragged her from the table; swung her around; dragged her to a different lunch table; dropped her on the bench and walked away without so much as a simple inquiry into her welfare or well-being after the act of aggression (the "Incident"). *See id.*

50.    In response, Principal Esposito found Ms. Zawada's behavior to be concerning enough to report the incident to Ms. Banks, but did not follow the procedures outlined in Howard County Public School System ("HCPSS") Policy 1030 ("Policy 1030") which requires that he report any and all child abuse, including child abuse exacted by a school employee to law enforcement and/or the Department of Social Services.

51.    When Ms. Banks viewed the footage the following day, she left Principal Esposito's office and contacted colleague and criminal justice reform advocate Topeka Sam ("Advocate Sam") to explain what she witnessed happen to her daughter at the hands of Ms. Zawada. Advocate Sam told her to call local law enforcement to report the abuse. Ms. Banks did so and local law enforcement reported to Running Brook's campus to investigate.

52.    On the basis of the video and out of a particular level of concern regarding the several seconds Ms. Zawada took to pause and consider her next act before aggressively grabbing Lyric, the officer charged Ms. Zawada with second degree assault.

53.    Sometime thereafter, Ms. Banks was informed that Ms. Zawada had been terminated as a lunch monitor at Running Brook Elementary School. However, Ms. Zawada was not, in fact, terminated. Rather, she was allegedly put on administrative leave pending the outcome of an external and internal investigation.

54. Despite the outcome of either investigation, Ms. Zawada was granted liberal access to Running Brook and no steps were taken to ensure that L.B. did not come into contact with her at the school.

55. Ms. Zawada's presence at Running Brook torments nine-year old L.B. as does Ms. Zawada's son who recently targeted and taunted L.B. and her friends at a trunck-or-treat event at the school by setting out to and effectuating a flagrant heist of the girls' candy which concerned Ms. Banks because it seemed predatory, particularly given that Ms. Zawada's oldest son has at least once been disciplined by HCPSS for racially motivated and discriminatory behavior and/or language.

56. L.B. is not just scared to attend school, but is also emotionally wounded and constantly concerned that she is unsafe.

57. L.B. has voiced concerns to her mother that Ms. Zawada is also assassinating her character with the teachers and staff at Running Brook. Although L.B. has experienced and her mother has witnessed frequent and blatant mistreatment of the majority minority population at Running Brook, as of late, the behavior has become more outrageous and more specifically tailored toward L.B. For example, a few weeks ago, the nurse refused to allow L.B. to use her inhaler after a sporting activity and, but for the insistence of the coach, the nurse would not have permitted her to use the prescribed medication with no explanation for the refusal, simply "no."[3]

58. The Incident is only one in a long list of ongoing harassing, racist and discriminatory behaviors at Running Brook. Consequently, Ms. Banks has had to take time off from her business tasks to frequent the School, visit Lyric's classroom, and sit with her at lunch. She is also constantly forced to communicate with the School's administration as to her

---

[3] The nurse refused to treat L.B. on more than one occasion.

concerns regarding, not only the treatment of Lyric, but in advocacy for the other brown and black children whose right to a free education is being infringed upon and impeded by persistent discriminatory behavior at the school.

59. For example, on or about October 4, 2019, Ms. Banks witnessed a teacher screaming at the children simply because they were requesting an additional snack. School starts at 9:20 a.m. and fourth grade lunch does not begin until 1:45 p.m. The children are permitted one snack at approximately 11:30 a.m. (which they bring from home) and have twenty (20) minutes to eat their snacks; however, they are not allowed to go back to get an additional snack even within the twenty (20) minute timeframe. The children are left hungry for an additional two (2) hours until lunch time and not permitted an afternoon snack. Then, they are screamed at and disciplined for requesting something else to eat. There have been countless other times that Ms. Banks has witnessed teachers screaming at the students.

60. The children are also denied access to the bathroom and to water breaks even though their requests are, more often than not, legitimate to the point where children have been forced to have accidents and then not permitted to go to the nurse to change and left to sit in the classroom in their soiled clothing.

61. The brown children are also over-disciplined compared to their white counterparts and are forced to admit to wrongs that they did not actually commit in order to receive discipline.

62. The brown children are more frequently sent to the office and more often denied access to the bathroom, water, snacks and other basic liberties and freedoms to which all human beings are entitled.

63. The over-aggressive, discipline-focused, discriminatory manner by which the brown and black students are treated puts the brown and black children in a position where they

have to defend themselves to their teachers, causing them to lash out in ways that are uncharacteristic – behaviors which they are again disciplined on the basis of.

64. The students are also over-diagnosed, over treated for mental health and behavioral issues, and under afforded opportunities for advancement. In fact, the administrators and teachers have communicated that L.B. is a gifted and talented, advanced communicator and student. Still, they pressured her mother into agreeing to allow her to work with a behavioral specialist instead of putting her into a gifted and talent program. Both the specialist and Ms. Banks requested that the school test L.B. to make sure that she is on grade-level. Those requests went un-responded to. When Ms. Banks further requested information, she was told that L.B.was now being assessed as behind grade level, despite excellent, above-average marks on her report card and satisfactory marks on her most recent progress report (the highest mark available). Ms. Banks was provided with no information and no means or tools to rely upon in order to bring L.B. up to speed if she is, in fact, behind, rather than ahead of her peers.

65. There are several other events and repeated acts which have taken and continue to take place at the school and to L.B. which one may consider to be "dog-whistle" racism. That is to say that L.B. understands she is being mistreated when the event occurs and/or that she is witnessing mistreatment, but given her age and experience she does not know why she is being mistreated or understand the emotional impact of the discriminatory environment she is expected, not only to tolerate, but to submit.

66. The Incident and each subsequent incident, including refusing to prosecute Ms. Zawada, resulted in the infliction of severe emotional distress on L.B. and her mother. The Defendants knew that such distress was substantially certain to result from his actions and acted recklessly and in deliberate disregard of a high probability that emotional distress would follow.

16

67.     As a result of the Defendants' individual and collective tortious actions, L.B. and her mother suffered damages, including emotional trauma, physical injury, distress, and damage to their reputations and the loss of his employment.

## COUNT VII and VIII
### Negligence and Gross Negligence

*(All Defendants)*

68.     Ms. Banks incorporates the allegations made in Paragraphs 1-67 of this Complaint as if fully stated herein.

69.     Ms. Banks asserts this claim against all Defendants, in both their official and personal capacities.

70.     Ms. Zawada – with little or no verbal request – aggressively grabbed both arms of then-third grade (female) student L.B. in an attempt to move her to an assigned lunch seat. *See id.*

71.     When L.B. resisted the unnecessary, unwarranted, and inappropriate force, Ms. Zawada paused in frustration; double-backed, aggressively grabbed L.B.'s arms a second time; dragged her from the table; swung her around; dragged her to a different lunch table; dropped her on the bench and walked away without so much as a simple inquiry into her welfare or well-being after the act of aggression (the "Incident"). *See id.*

72.     In response, Principal Esposito found Ms. Zawada's behavior to be concerning enough to report the incident to Ms. Banks, but did not follow the procedures outlined in Howard County Public School System ("HCPSS") Policy 1030 ("Policy 1030") which requires that he report any and all child abuse, including child abuse exacted by a school employee to law enforcement and/or the Department of Social Services.

73.     When Ms. Banks viewed the footage the following day, she left Principal Esposito's office and contacted colleague and criminal justice reform advocate Topeka Sam

mother has witnessed frequent and blatant mistreatment of the majority minority population at Running Brook, as of late, the behavior has become more outrageous and more specifically tailored toward L.B. For example, a few weeks ago, the nurse refused to allow L.B. to use her inhaler after a sporting activity and, but for the insistence of the coach, the nurse would not have permitted her to use the prescribed medication with no explanation for the refusal, simply "no."[4]

80.     The Incident is only one in a long list of ongoing harassing, racist and discriminatory behaviors at Running Brook. Consequently, Ms. Banks has had to take time off from her business tasks to frequent the School, visit Lyric's classroom, and sit with her at lunch. She is also constantly forced to communicate with the School's administration as to her concerns regarding, not only the treatment of Lyric, but in advocacy for the other brown and black children whose right to a free education is being infringed upon and impeded by persistent discriminatory behavior at the school.

81.     For example, on or about October 4, 2019, Ms. Banks witnessed a teacher screaming at the children simply because they were requesting an additional snack. School starts at 9:20 a.m. and fourth grade lunch does not begin until 1:45 p.m. The children are permitted one snack at approximately 11:30 a.m. (which they bring from home) and have twenty (20) minutes to eat their snacks; however, they are not allowed to go back to get an additional snack even within the twenty (20) minute timeframe. The children are left hungry for an additional two (2) hours until lunch time and not permitted an afternoon snack. Then, they are screamed at and disciplined for requesting something else to eat. There have been countless other times that Ms. Banks has witnessed teachers screaming at the students.

---

[4] The nurse refused to treat L.B. on more than one occasion.

82.     The children are also denied access to the bathroom and to water breaks even though their requests are, more often than not, legitimate to the point where children have been forced to have accidents and then not permitted to go to the nurse to change and left to sit in the classroom in their soiled clothing.

83.     The brown children are also over-disciplined compared to their white counterparts and are forced to admit to wrongs that they did not actually commit in order to receive discipline.

84.     The brown children are more frequently sent to the office and more often denied access to the bathroom, water, snacks and other basic liberties and freedoms to which all human beings are entitled.

85.     The over-aggressive, discipline-focused, discriminatory manner by which the brown and black students are treated puts the brown and black children in a position where they have to defend themselves to their teachers, causing them to lash out in ways that are uncharacteristic – behaviors which they are again disciplined on the basis of.

86.     The students are also over-diagnosed, over treated for mental health and behavioral issues, and under afforded opportunities for advancement.  In fact, the administrators and teachers have communicated that L.B. is a gifted and talented, advanced communicator and student.  Still, they pressured her mother into agreeing to allow her to work with a behavioral specialist instead of putting her into a gifted and talent program.  Both the specialist and Ms. Banks requested that the school test L.B. to make sure that she is on grade-level.  Those requests went un-responded to.  When Ms. Banks further requested information, she was told that L.B.was now being assessed as behind grade level, despite excellent, above-average marks on her report card and satisfactory marks on her most recent progress report (the highest mark available).  Ms. Banks was provided

with no information and no means or tools to rely upon in order to bring L.B. up to speed if she is, in fact, behind, rather than ahead of her peers.

87.     There are several other events and repeated acts which have taken and continue to take place at the school and to L.B. which one may consider to be "dog-whistle" racism. That is to say that L.B. understands she is being mistreated when the event occurs and/or that she is witnessing mistreatment, but given her age and experience she does not know why she is being mistreated or understand the emotional impact of the discriminatory environment she is expected, not only to tolerate, but to submit.

88.     The Incident and each subsequent incident, including refusing to prosecute Ms. Zawad was negligent as to each Defendant.

89.     Defendants had a lawful duty to refrain from committing an assault and/or battery against his person and/or to engage in actions to rectify the behavior, including prosecuting Ms. Zawada.   Defendants actions, collectively and individually, resulted in a breach of the aforementioned duty.

90.     The tortious actions of Defendants L.B. and her mother to suffer damages, including physical injury, emotional trauma, distress, and damage to their reputation, the loss of his employment and loss of wages.

### COUNT IX
### Invasion of Privacy/False Light

*(all Defendants)*

91.     L.B. incorporates the allegations made in Paragraphs 1-90 of this Complaint as if fully stated herein.

92.     Ms. Banks asserts this claim against all Defendants, in both their official and individual capacities.

21

93.     Ms. Zawada – with little or no verbal request – aggressively grabbed both arms of then-third grade (female) student L.B. in an attempt to move her to an assigned lunch seat. *See id.*

94.     When L.B. resisted the unnecessary, unwarranted, and inappropriate force, Ms. Zawada paused in frustration; double-backed, aggressively grabbed L.B.'s arms a second time; dragged her from the table; swung her around; dragged her to a different lunch table; dropped her on the bench and walked away without so much as a simple inquiry into her welfare or well-being after the act of aggression (the "Incident"). *See id.*

95.     In response, Principal Esposito found Ms. Zawada's behavior to be concerning enough to report the incident to Ms. Banks, but did not follow the procedures outlined in Howard County Public School System ("HCPSS") Policy 1030 ("Policy 1030") which requires that he report any and all child abuse, including child abuse exacted by a school employee to law enforcement and/or the Department of Social Services.

96.     When Ms. Banks viewed the footage the following day, she left Principal Esposito's office and contacted colleague and criminal justice reform advocate Topeka Sam ("Advocate Sam") to explain what she witnessed happen to her daughter at the hands of Ms. Zawada. Advocate Sam told her to call local law enforcement to report the abuse. Ms. Banks did so and local law enforcement reported to Running Brook's campus to investigate.

97.     On the basis of the video and out of a particular level of concern regarding the several seconds Ms. Zawada took to pause and consider her next act before aggressively grabbing Lyric, the officer charged Ms. Zawada with second degree assault.

98.     Sometime thereafter, Ms. Banks was informed that Ms. Zawada had been terminated as a lunch monitor at Running Brook Elementary School. However, Ms. Zawada was

not, in fact, terminated. Rather, she was allegedly put on administrative leave pending the outcome of an external and internal investigation.

99. Despite the outcome of either investigation, Ms. Zawada was granted liberal access to Running Brook and no steps were taken to ensure that L.B. did not come into contact with her at the school.

100. Ms. Zawada's presence at Running Brook torments nine-year old L.B.as does Ms. Zawada's son who recently targeted and taunted L.B.and her friends at a trunck-or-treat event at the school by setting out to and effectuating a flagrant heist of the girls' candy which concerned Ms. Banks because it seemed predatory, particularly given that Ms. Zawada's oldest son has at least once been disciplined by HCPSS for racially motivated and discriminatory behavior and/or language.

101. L.B. is not just scared to attend school, but is also emotionally wounded and constantly concerned that she is unsafe.

102. L.B. has voiced concerns to her mother that Ms. Zawada is also assassinating her character with the teachers and staff at Running Brook. Although L.B. has experienced and her mother has witnessed frequent and blatant mistreatment of the majority minority population at Running Brook, as of late, the behavior has become more outrageous and more specifically tailored toward L.B. For example, a few weeks ago, the nurse refused to allow L.B.to use her inhaler after a sporting activity and, but for the insistence of the coach, the nurse would not have permitted her to use the prescribed medication with no explanation for the refusal, simply "no."[5]

103. The Incident is only one in a long list of ongoing harassing, racist and discriminatory behaviors at Running Brook. Consequently, Ms. Banks has had to take time off

---

[5] The nurse refused to treat L.B. on more than one occasion.

from her business tasks to frequent the School, visit Lyric's classroom, and sit with her at lunch. She is also constantly forced to communicate with the School's administration as to her concerns regarding, not only the treatment of Lyric, but in advocacy for the other brown and black children whose right to a free education is being infringed upon and impeded by persistent discriminatory behavior at the school.

104. For example, on or about October 4, 2019, Ms. Banks witnessed a teacher screaming at the children simply because they were requesting an additional snack. School starts at 9:20 a.m. and fourth grade lunch does not begin until 1:45 p.m. The children are permitted one snack at approximately 11:30 a.m. (which they bring from home) and have twenty (20) minutes to eat their snacks; however, they are not allowed to go back to get an additional snack even within the twenty (20) minute timeframe. The children are left hungry for an additional two (2) hours until lunch time and not permitted an afternoon snack. Then, they are screamed at and disciplined for requesting something else to eat. There have been countless other times that Ms. Banks has witnessed teachers screaming at the students.

105. The children are also denied access to the bathroom and to water breaks even though their requests are, more often than not, legitimate to the point where children have been forced to have accidents and then not permitted to go to the nurse to change and left to sit in the classroom in their soiled clothing.

106. The brown children are also over-disciplined compared to their white counterparts and are forced to admit to wrongs that they did not actually commit in order to receive discipline.

107. The brown children are more frequently sent to the office and more often denied access to the bathroom, water, snacks and other basic liberties and freedoms to which all human beings are entitled.

108. The over-aggressive, discipline-focused, discriminatory manner by which the brown and black students are treated puts the brown and black children in a position where they have to defend themselves to their teachers, causing them to lash out in ways that are uncharacteristic – behaviors which they are again disciplined on the basis of.

109. The students are also over-diagnosed, over treated for mental health and behavioral issues, and under afforded opportunities for advancement. In fact, the administrators and teachers have communicated that L.B. is a gifted and talented, advanced communicator and student. Still, they pressured her mother into agreeing to allow her to work with a behavioral specialist instead of putting her into a gifted and talent program. Both the specialist and Ms. Banks requested that the school test L.B. to make sure that she is on grade-level. Those requests went un-responded to. When Ms. Banks further requested information, she was told that L.B. was now being assessed as behind grade level, despite excellent, above-average marks on her report card and satisfactory marks on her most recent progress report (the highest mark available). Ms. Banks was provided with no information and no means or tools to rely upon in order to bring L.B. up to speed if she is, in fact, behind, rather than ahead of her peers.

110. There are several other events and repeated acts which have taken and continue to take place at the school and to L.B. which one may consider to be "dog-whistle" racism. That is to say that L.B. understands she is being mistreated when the event occurs and/or that she is witnessing mistreatment, but given her age and experience she does not know why she is being mistreated or understand the emotional impact of the discriminatory environment she is expected, not only to tolerate, but to submit.

111. The Incident and each subsequent incident, including refusing to prosecute Ms. Zawada, resulted in the infliction of severe emotional distress on L.B. and her mother. The

Defendants knew that tsuch distress was substantially certain to result from his actions and acted recklessly and in deliberate disregard of a high probability that emotional distress would follow.

112.    Subsequent to the attack, L.B. and Ms. Banks suffered ridicule, taunting, harassment as many HCPSS professionals, parents, neighbors and teachers learned about the Incident through word of mouth and of Ms. Banks pursuit of charges against Ms. Zawada.

113.    As such, the Incident became public.

114.    'It was an invasion of Ms. Banks and L.B.'s privacy by Ms. Zawada, HCPSS and all Defendants because they possessed no authority to assault L.B., to sanction the assault, and/or to fail to prosecute the assault on the basis that Ms. Zawada had endured enough in being terminated (which she was not), placing Ms. Banks and L.B. in a false light and attributing to the public characteristics, conduct and/or beliefs as to them which were false.

115.    The Defendants had actual knowledge and/or a reckless disregard of the falsity.

116.    The manner in which the Defendants publicized the false information would be highly offensive to a reasonable person.

117.    Ms. Banks did not consent to the Defendants' conduct. *See id.*

118.    The Defendants had no right to invade L.B.'s and Ms. Banks privacy.

119.    The Defendants acted with malice in invading Ms. Banks and L.B.'s privacy.

120.    The tortious actions of the Defendants caused L.B. and her mother to suffer damages, including emotional trauma, distress, damage to their reputation and the loss of wages.

**JURY DEMAND**

Ms. Banks respectfully request a jury trial.

**PRAYER FOR RELIEF**

Ms. Banks respectfully requests the following relief:

a.    A Declaratory Judgment forcing the Office of the State's Attorney and State's Attorney Richard Gibson to prosecute Ms. Zawada for the conduct alleged in this Complaint.

b.    A permanent injunction that bars Ms. Zawada from liberal access to the campus of Running Brook Elementary School.

c.    Compensatory damages for the physical injuries, emotional trauma, humiliation, distress, as well as for the loss of wages Ms. Banks suffered in tending to the matters alleged in this Complaint.

d.    Punitive damages for the physical injuries, emotional trauma, humiliation, distress, as well as for the loss of wages Ms. Banks suffered in tending to the matters alleged in this Complaint.

e.    In accordance with 42 U.S.C. § 1988 and/or any other relevant law, an award for costs, expenses and attorney's fees;

f.    Pursuant to MD SB629, the Access to Maryland Courts Act, now in committee, an award for costs, expenses and attorney's fees;

g.    Any other relief as this Honorable Court may deem just and deserving.


Respectfully submitted,

THE LAW OFFICE OF
CHRISTINA J. BOSTICK


___/s/ Christina J. Bostick_____
Christina J. Bostick, Esq.
CPF No.:  1012140073
*cjbostick@BostickLawOffice.com*
9520 Berger Road
Suite 212

Columba, Maryland 21046
1 (855) 267-8425 (t)
(443) 283-4295 (f)

*Attorney for Plaintiff*

# IN THE CIRCUIT COURT FOR
## HOWARD COUNTY, MARYLAND

**MONICA BANKS, et al.**

     **Plaintiffs,**

  **vs.**

**MICHAEL J. MARTIRANO, et al.**

     **Defendants.**

**Civil Action No. C-13-CV-19-001189**

## LINE
### (*Tangible Exhibit*)

Plaintiff, Monica Banks, by and through her undersigned counsel, pursuant to Maryland Rules 16-405, hereby files this Line enclosing a tangible exhibit, namely **Exhibit A** to Plaintiff's Complaint for Assault, Battery, and the Violation of Various Civil Rights.

Respectfully submitted,

THE LAW OFFICE OF
CHRISTINA J. BOSTICK

Christina J. Bostick, Esq.
CPF No.: 1012140073
*cjbostick@BostickLawOffice.com*
9520 Berger Road
Suite 212
Columba, Maryland 21046
1 (855) 267-8425 (t)
(443) 283-4295 (f)

*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 15th day of June 2020, a copy of the foregoing was sent via first-class mail to:

**MICHAEL J. MARTIRANO**
**HOWARD COUNTY PUBLIC SCHOOL SYSTEM**
10910 Clarksville Pike
Ellicott City, MD 21042

**THE HOWARD COUNTY BOARD OF EDUCATION**
Mavis Ellis (Chair of the Board)
10910 Clarksville Pike
Ellicott City, MD 21042

**RUNNING BROOK ELEMENTARY SCHOOL**
**ANTHONY ESPOSITO**
5215 W Running Brook Rd
Columbia, MD 21044

**KELLY MARIE ZAWADA**
5223 Hermit Path
Columbia, MD 21044-0000

**RICH GIBSON**
**OFFICE OF THE STATE'S ATTORNEY FOR HOWARD COUNTY**
Carroll Building – Second Floor
3450 Courthouse Drive
Ellicott City, MD 21043

**HOWARD COUNTY OFFICE OF HUMAN RIGHTS**
Janssen Evelyn (Acting Administrator)
9820 Patuxent Woods Drive, Suite 237
Columbia, MD 21046

**HOWARD COUNTY POLICE DEPARTMENT**
Lisa D. Myers (Chief of Police)
3410 Court House Drive
Ellicott City, MD 21043

Christina J. Bostick, Esquire

**EXHIBIT A - TANGIBLE EXHIBIT - VIDEO ON USB**



Board of Education

# Policy 1010 - Anti-Discrimination

The purpose of this policy is to establish expectations for behavior that promote a safe, engaging and supportive school environment and provide direction for students, employees, and third parties in recognizing and reporting discrimination in accordance with this policy and with local, state, and federal requirements.

**Policy Document** | Implementation Procedures |

## I. Policy Statement

The Board of Education is committed to providing an educational and work environment that is free from discrimination, fosters equitable opportunities, and values diversity and commonality. The Board prohibits discrimination on the basis of race, color, creed, national origin, immigration status, religion, physical, mental, or educational disability, pregnancy, age, gender, gender expression, gender identity, genetic information, sexual orientation, marital status, veteran status or socioeconomic status in the educational program, including co-curricular and extra-curricular activities, and in the workplace.

The Board recognizes its responsibility to promote worth, dignity, respect, and safety and therefore prohibits discrimination through curriculum, instruction, professional development, and resource selection.

Employees, students, and third parties share responsibility for the health, safety, and general welfare of students and for creating and ensuring an environment free from discrimination.

Employees, students, and third parties may be subject to disciplinary action or consequences for discriminatory behavior even when the behavior does not rise to the level of discrimination as defined by prevailing federal and state laws.

## II. Purpose

The purpose of this policy is to establish expectations for behavior that promote a safe, supportive school and work environment and provide direction for students, employees, and third parties in recognizing and reporting discrimination in accordance with this policy and with local, state, and federal requirements.

## III. Definitions

Within the context of this policy, the following definitions apply:

A. Discrimination – Any act or omission due to an individual's status or perceived status in a protected class that creates an intimidating, hostile, or offensive working or educational environment; or substantially interferes with an individual's ability to work, learn, or otherwise is sufficiently serious to limit an individual's employment opportunities, or to limit a student's ability to participate in or benefit from the educational program.

B. Parent – Any one of the following, recognized as the adult(s) legally responsible for the student:

　1. Biological Parent – A natural parent whose parental rights have not been terminated.

　2. Adoptive Parent – A person who has legally adopted the student and whose parental rights have not been terminated.

　3. Custodian – A person or agency appointed by the court as the legal custodian of the student and granted parental rights and responsibilities.

　4. Guardian – A person who has been placed by the court in charge of the affairs of the student and granted parental rights and responsibilities.

　5. Caregiver – An adult resident of Howard County who exercises care, custody, or control over the student but who is neither the biological parent nor legal guardian, as long as the person satisfies the requirements of the Education Article, §7-101 (c) (Informal Kinship Care).

　6. Foster Parent – An adult approved to care for a child who has been placed in their home by a state agency or a licensed child placement agency as provided by the Family Law Article, §5-507.

C. Protected Class – A group's characteristics to include the following: race, color, creed, national origin, immigration status, religion, physical, mental, or learning disability, pregnancy, age, gender, gender expression, gender identity, genetic information, sexual orientation, marital status, veteran status or socioeconomic status.

D. Respondent – An individual named by a complainant as allegedly violating the policy.

E. Retaliation – The act or process of threatening or otherwise penalizing a person for reporting an alleged violation of policy or for participating in an investigation of an alleged violation.

F. School-Related Activity – Any school systemactivity, on or off school property, in which a student directly participates (e.g., school field trip, athletic event, or class/graduation activity), or an activity in which the student does not directly participate but represents the school or student body simply by being present (e.g., spectator at a school event).

G. Third Party – Parents, mentors, volunteers, vendors, contractors and others with whom students or employees interact during school or school-related activities.

## IV. Standards

A. It is a violation of this policy for any student, employee, or third party to engage in acts of discrimination in schools, school system offices, or at school-related activities, or at school system sponsored activities.

Student, employee, or third party behavior may be severe enough to violate state and/or federal laws prohibiting discrimination in educational institutions and the workplace.

This generally occurs when:

1. Submission to such conduct is made either explicitly or implicitly a termor condition of the individual's employment or educational status.

2. Such conduct has the purpose or effect of substantially interfering with an individual's work or educational performance or creating an intimidating, hostile, or offensive environment, which may include online and social media.

B. It is a violation of this policy for any student, employee, or third party to engage in retaliation with regard to allegations or complaints of discrimination.

C. Discrimination on the basis of gender includes harassment, which is addressed in Policy 1020 Sexual Discrimination, and Title IX. Harassment, defamation, and intimidation that are not discriminatory in nature are addressed in Policy 1040 Safe and Supportive Schools, and in Policy 1060 Bullying, Cyberbullying, Harassment, or Intimidation.

D. The HCPSS will promote the worth and dignity of all individuals through curriculum, instruction, professional development, and resource selection in accordance with state regulation.

1. The HCPSS will provide PreK-12 curricula and instructional strategies that enable students to demonstrate an understanding of and respect for living in a culturally pluralistic society.

2. Instructional staff will use strategies that appropriately address students' identities and learning styles while providing rigorous instruction for all students to increase academic achievement.

3. Instructional staff will be provided with curricula that:

    a. Avoids stereotyping, discrimination, bias, and prejudice;

    b. Reflects the diverse experiences relating to cultural groups and individuals;

    c. Is representative of the diversity of society and assist students to demonstrate an understanding of the experiences of individuals and groups.

4. The HCPSS will provide professional development to prepare employees to design, manage, implement, and evaluate multicultural education.

E. Discrimination complaints can be filed by those who believe they are being subjected to discrimination and by those who believe they are a witness to discrimination against others.

F. A student will file a discrimination complaint orally or in writing with a teacher, school counselor, school-based administrator, or the Equity Assurance Manager/designee for action in accordance with established procedures. All such reports that allege discrimination by an employee or third party will be filed with or forwarded to the Equity Assurance Manager/designee.

G. An employee or third party will file a discrimination complaint with the Equity Assurance Manager/designee or with a school-based administrator or supervisor as appropriate. All such reports will be forwarded to the Equity Assurance Manager/designee.

H. Staff members and school-based administrators who believe discrimination has occurred will take action promptly in accordance with established procedures as defined in the implementation procedures of this policy.

I. The school-based administrator, supervisor, or the Equity Assurance Manager/designee will commence an investigation of the allegations of discrimination regardless of how the alleged discrimination is reported within two working days, and address

any findings of discrimination.

J. Utilization and/or exhaustion of these procedures are not aprerequisite for the filing of an administrative complaint of discrimination with a government agency or taking other legal action.

K. Upon completion of an investigation of a complaint, the individual conducting the investigation will consult with the Equity Assurance Manager/designee. After consultation, that individual will send a written report of the findings and recommended corrective action, if any, within confidentiality guidelines to the complainant and the respondent within thirty calendar days excluding extenuating circumstances.

L. The complainant and the respondent are entitled to appeal the findings and/or recommended corrective action. All appeals will be decided by the Superintendent/Designee.

M. In all phases of complaint resolution, every reasonable effort shall be made to maintain the confidentiality and protect the privacy of all parties. These efforts may be limited by the school system's legal and regulatory obligation to investigate and address allegations of discrimination.

N. To provide resolution of violations, employees in supervisory or management positions are responsible for taking steps designed to end any existing discrimination by those under their supervision, prevent any recurrence, and remedy any detrimental effects on the complainant and others.

O. Upon the finding of violation, remedies available to complainants include, but are not limited to, counseling, imposition of an order against the guilty party prohibiting further contact with the complainant or others, reinstatement of employment to the complainant, reconsideration of an award of a contract with the school system or any other remedy as is just and services the interest of reinstating the complainant to his/her position prior to the discrimination.

P. Violations of this policy are cumulative; subsequent offenses will affect the nature and severity of the consequences.

Q. Students who violate this policy will have consequences that include all appropriate forms of discipline including expulsion fromschools. Disciplinary action against a student will be administered in accordance with the HCPSS Student Code of Conduct, Policy 9000 - Student Residency, Eligibility, Enrollment and Assignment and Policy 9200 - Student Discipline. In addition, a student who violates this policy may also be required to participate in an appropriate education intervention and/or counseling designated by the school administrator and designed to increase his or her understanding of the offense and the impact on others.

R. Employees who violate this policy will have consequences that include all appropriate forms of discipline including termination of employment. Disciplinary action against school system employees will be administered in accordance with Policy 7030 Employee Conduct and Discipline. A violation of this policy may require, as a condition of continuing employment or other relationship with the school system, participation in counseling and/or other interventions designed to assist in the recognition and correction of the offending behavior/conduct.

S. Action against third parties will be taken in accordance with relevant school system policies and other applicable state and federal laws. Actions may include ceasing further business with the third party, modifying the terms of the contract, discontinuance of the contract, or banning fromthe property.

T. Notice that acts of discrimination are prohibited in the Howard County Public School System (HCPSS) will be communicated to all students, families, employees, and third parties, and the community annually by public notifications, school web-sites, school newsletters, faculty handbooks and other customary channels.

## V. Responsibilities

A. Principals will notify students, families, third parties, and employees in their schools in a timely manner of all of the provisions within this policy.

B. Supervisors will notify all those under their immediate supervision of the provisions within this policy.

C. The Superintendent/Designee will facilitate the communication of the provisions within this policy annually through customary channels such as email, literature, power points, or any other viable communication.

D. The Equity Assurance Manager/designee will commence appropriate action within two working days upon receipt of the complaint regardless of how the complaint is reported.

E. Employees will monitor the behavior of students, staff, and third parties, and respond within one working day in an appropriate manner to both observed and reported violations of this policy.

F. All employees in supervisory or management positions will take the necessary steps designed to end any existing discrimination by those under their supervision, to prevent any recurrence, and to correct discriminatory effects on the complainant and others.

## VI. Delegation of Authority

The Superintendent is authorized to develop appropriate procedures for the implementation of this policy.

## VII. References

A. Legal

- Title IX of the Education Amendments of 1972, 20 U.S.C. Sec. 1681

- Title VI and VII of the Civil Rights Act of 1964, 42 U.S.C., Sec 601 and Sec. 2000e.2

- Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 Americans with Disabilities Act (ADA), 42 U.S.C. 12131 et seq.

- Individuals with Disabilities Education Act (IDEA), 20 U.S.C. 1400-1487

- Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. Sec. 794

- The Annotated Code of Maryland, Article 49B Human Relations Commission: Discrimination in Employment, Section 16 (Unlawful Employment Practices)

- The Annotated Code of Maryland, Education Article, Section 7-421 (Safe Schools Reporting Act of 2005)

- COMAR 13A.04.05 (Education that is Multicultural)

- COMAR 13A.08.01.15 (Reporting Delinquent Acts)

B. Other Board Policies

- Policy 1000 - Civility
- Policy 1020 - Sexual Discrimination
- Policy 1030 - Child Abuse and Neglect
- Policy 1060 - Bullying, Cyberbullying, Harassment, or Intimidation
- Policy 7030 - Employee Conduct and Discipline
- Policy 8000 - Curriculum
- Policy 8080 - Responsible Use of Technology and Social Media
- Policy 9020 - Students' Rights and Responsibilities
- Policy 9060 - Rehabilitation Act of 1973 Compliance: Section 504

- Policy 9200 - Student Discipline
- Policy 10000 - Parent, Family and Community Involvement

C. Relevant Data Sources

D. Other

- Formal Parent Concern Form
- HCPSS Student Code of Conduct
- HCPSS Student Statement/Witness Form
- Recognizing Safe Schools Zone Resolution

## VIII. History

ADOPTED: May 28, 1980

REVIEWED:

MODIFIED: August 14, 2014

REVISED: October 25, 1990, January 30, 2001, February 7, 2008, June 7, 2018

EFFECTIVE: July 1, 2018

## Howard County Public School System

10910 Clarksville Pike
Ellicott City, MD 21042
Main Phone: (410) 313-6600

Staff Directory | Inclusivity & Accessibility

